## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CCAR INVESTMENTS, INC., derivatively on behalf of AMERISOURCEBERGEN CORP., | |
| Plaintiff, | Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| ORNELLA BARRA, STEVEN H. COLLIS, DOUGLAS R. CONANT, CHARLES H. COTROS, D. MARK DURCAN, RICHARD W. GOCHNAUER, RICHARD C. GOZON, LON R. GREENBERG, EDWARD E. HAGENLOCKER, JANE E. HENNEY, KATHLEEN W. HYLE, MICHAEL J. LONG and HENRY W. McGEE, | **REDACTED PUBLIC VERSION** |
| Defendants, | |
| -and- | |
| AMERISOURCEBERGEN CORP., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*Of Counsel*:

LEVI & KORSINSKY, LLP
Gregory Mark Nespole
Daniel Tepper
55 Broadway, 10th Floor
New York, NY 10006
(212) 363-7500

ASHBY & GEDDES, P.A.
Stephen E. Jenkins (#2152)
F. Troupe Mickler IV (#5361)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
sjenkins@ashbygeddes.com
tmickler@ashbygeddes.com

*Attorneys for Plaintiff*

Dated: July 17, 2020

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CCAR INVESTMENTS, INC., derivatively on behalf of AMERISOURCEBERGEN CORP., | |
| Plaintiff, | Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| ORNELLA BARRA, STEVEN H. COLLIS, DOUGLAS R. CONANT, CHARLES H. COTROS, D. MARK DURCAN, RICHARD W. GOCHNAUER, RICHARD C. GOZON, LON R. GREENBERG, EDWARD E. HAGENLOCKER, JANE E. HENNEY, KATHLEEN W. HYLE, MICHAEL J. LONG and HENRY W. McGEE, | |
| Defendants, | |
| -and- | |
| AMERISOURCEBERGEN CORP., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff CCAR Investments, Inc. ("**Plaintiff**"), by and through its undersigned counsel, submits this Complaint against the defendants named herein derivatively on behalf of nominal defendant AmerisourceBergen Corp. ("**AmerisourceBergen**" or the "**Company**"). The allegations in this Complaint are based on Plaintiff's knowledge as to itself and upon information and belief, including the investigation of counsel, the review of publicly available information, and the review of books and records produced by the Company in response to Plaintiff's demand made under 8 *Del. C.* § 220 as to all other matters, all of which books and records are expressly incorporated by reference into this Complaint. For the avoidance of doubt, this incorporation by reference does not change the pleading standard applicable to any motion to dismiss that may be filed in this case.

## PRELIMINARY STATEMENT

1.     Thirteen years. It has been thirteen years since the board of directors of AmerisourceBergen (the "**Board**") was told in no uncertain terms that the Company was part of the opioid crisis that was then, and still now, sweeping America. Between 2007 and the present, opioid drugs distributed by the Company for very large profits have passed out of legitimate hands and gone into grey and black markets, where they have addicted tens or hundreds of thousands of Americans, killed many of them, and made the Company a target of law enforcement and legislatures throughout the United States. During those thirteen years, the Company has paid out large sums in fines, and launched countless initiatives, plans, and programs to purportedly deal with this issue. Proclamations are made, announcements of good faith are promulgated, compliance personnel are hired, and yet the issue never comes close to being solved as scandal follows scandal.

2.     For example, between 2012 (*five years* after the Company first came under serious fire for shipping opioids that it should have known were not all going to reach legal and legitimate consumers) and 2017, the Company shipped approximately 650 million doses of opioids to Missouri, about 109 million doses per year. Based on the state's population, the numbers work out to about 18 opioid doses per year for every man, woman, and child in the State of Missouri. Considering that AmerisourceBergen had only about 40% of the opioid market in the state, at the rates described above, about 12.3% of the state's population would have been getting one opioid dose per day. In other words, either the Company was convinced that Missouri was the epicenter of a pain epidemic the size of which had never been seen before, or it had known *for years* that a vast amount of its highly profitable opioids was being diverted in Missouri for illegal purposes. As the Company became one of the largest drug pushers in world history, similar things happened in West Virginia and other states and localities across the United States. And all of this happened after the

Company had purportedly established strong regulatory compliance programs to prevent such shockingly abusive actions.

3.      For reasons that have never been disclosed in all of the happy talk contained in the Company's public relations materials and stockholder disclosures, AmerisourceBergen has been unable to stem its distribution of opioids to those who should not be receiving them. Instead, despite all the Company's very solemn pledges, year in and year out, law enforcement and legislators have unearthed scandal after scandal, and their patience with AmerisourceBergen appears to be getting shorter and shorter.

4.      The question raised by this action is "Where was the Board?" Boards of directors exist, in part, to monitor such situations – those in which management is allowing (and at some level of management, perhaps encouraging) the Company to engage in conduct that is at a minimum negligent, more probably reckless, and possibly criminal. Under Delaware law, corporate boards are required to install systems that will keep them informed about such problems so they can take action to protect the Company and its stockholders from the consequences of corporate lawbreaking and failure to comply with regulatory requirements.

5.      Here, the Company's board has told stockholders for years that it was taking action, was monitoring things, and engaging in good corporate governance. Yet, for the last 13 years – with many on the Board present for all or part of that time – it has been unable to keep the Company from repeatedly breaking the rules regarding the distribution of narcotics or from becoming a corporate scofflaw. If this problem is not fixed, and fixed fast, this sort of lawbreaking could lead to governmental action that might put the Company under.

6.      Delaware law is highly deferential to directors on issues such as this, but deference has its limits and those limits here were passed years ago. The Board knows full well that the

Company has had potentially corporate-life-threatening issues for years and has not fixed them. It is black-letter Delaware law that a board's utter failure to attempt to assure a reasonable information and reporting system exists is an act of bad faith in breach of the duty of loyalty. As set forth hereafter, after 13 years of failure, this Board knows that while it has information and reporting systems, they are facially dysfunctional because they are not working and otherwise unreasonable because they have failed again and again and again. And the Board has failed to take the drastic action that is necessary to get AmerisourceBergen back on the straight and narrow path to protect the corporate franchise and observe its duty to obey state and federal laws and regulations.

7.      In light of the foregoing, Plaintiff brings this stockholder derivative suit to hold certain of the Company's officers and members of the board of directors (the "**Board**") responsible for their roles in worsening and perpetuating the national opioid crisis, which affects every facet of American society. On average, at least 130 Americans die every day from an opioid overdose.[1] The prevalence of opioids has placed an unprecedented burden on this Country in terms of devastation to families, economic consequences, burden on healthcare systems, and increased incarceration. The opioid crisis has decimated entire communities.

8.      AmerisourceBergen is a global pharmaceutical distributor, which has unabashedly reaped the rewards from flooding the Country with dangerous, highly addictive narcotics under the guise of merely assisting in "pain management."

9.      Through its subsidiaries, the Company sells specialty drugs, including highly addictive and dangerous opioids, and is one of the world's largest wholesale distributors of opioids for purported pain management.

---

[1] https://www.cdc.gov/injury/features/prescription-drug-overdose/index.html (last accessed June 18, 2020).

10.     Federal and state laws mandate that distributors of prescription opioids must ensure their drugs are not being dispensed to the wrong people and finding their way to the streets.

11.     This duty, however, was of no consequence to the officers and directors of AmerisourceBergen as they repeatedly failed to adhere to the law and instead pushed these narcotics to generate ever more profits.

12.     As a result of this abhorrent and illegal conduct, AmerisourceBergen faces thousands of lawsuits and a federal criminal investigation for its role in fueling the opioid epidemic that has left a national tragedy in its wake. As such, the Company's officers and directors who failed to discharge their fiduciary duties must be held to account for the damage they caused to the Company and that they caused the Company to commit upon society.

13.     The scourge of the opioid epidemic is well documented. Since 1999, when opioids were first heavily marketed as a "safe" pain management treatment, the amount of prescription opioids sold to pharmacies, hospitals, and doctors' offices has more than quadrupled. During this time, however, overdose deaths from opioids increased by a stunning 600 percent. Hundreds of thousands of people have died from overdosing on opioids. In 2017 alone, overdoses involving opioids killed more than 47,000 people, and 36% of those deaths involved prescription opioids.[2] Millions more Americans struggle with opioid addiction every day.

14.     Despite the government's efforts to regulate prescription opioids, the opioid epidemic has continued unabated. Companies like AmerisourceBergen expanded the opioid market by increasing the distribution of prescription opioid drugs. The increased volume of opioid distribution led directly to skyrocketing addiction, overdose, and death. In October 2017, the

---

[2] *Id.*

President of the United States declared that the opioid "epidemic is a national public health emergency."[3]

15.     Despite the Company's Chairman, defendant Steven. H. Collis ("**Collis**"), acknowledging that prescription opioids only "represent a small fraction of our business and [that] stepping away from these drugs entirely would be the firmest possible stance we could take to combat the tragic opioid epidemic," AmerisourceBergen refuses to abandon this problematic line of business.[4]

16.     Moreover, as detailed herein, it is clear that the Board knew of the myriad illegal practices because it has settled charges brought against the Company. Yet the Board still allowed the Company to continue the illegal practices, only to be sanctioned again.

17.     Distributing addictive prescription opioids is a highly regulated industry, though such regulation has not stemmed the illegal flow of drugs. The laws regulating opioids mandate that pharmaceutical distributors, like AmerisourceBergen, enact and monitor systems and practices to ensure the lawful distribution and use of controlled substances and to prevent the diversion of controlled substances from the regulated medical distribution system into the illicit market.

18.     Under the Controlled Substances Act of 1970, 21 U.S.C. § 801 *et seq.* (the "**Controlled Substances Act**" or "**CSA**"), distributors of controlled substances like AmerisourceBergen are required by law to identify, halt, and report suspicious orders of controlled substances. The Company, however, has consciously failed in its duties. Indeed, companies like AmerisourceBergen routinely flout the CSA.

---

[3] https://philadelphia.cbslocal.com/2017/10/26/trump-opioid-epidemic-health-emergency/ (last accessed July 17, 2020).

[4] Steve Collis, *The Surprising Morality of Opioid Distribution*, LinkedIn.com (September 18, 2017), https://www.linkedin.com/pulse/surprising-morality-opioid-distribution-steve-collis/ (last accessed June 18, 2020).

19.     AmerisourceBergen repeatedly filled facially suspicious orders instead of sending reports to the proper authorities alerting them that suspicious, if not flagrantly illegal, activity was occurring. These facially suspicious orders accounted for such large quantities of prescription drugs or were made so frequently that it was beyond cavil that there could be no legitimate medical purpose for such orders. Furthermore, over the last twenty years, AmerisourceBergen continued to ship orders it identified as suspicious, with little or no documentation that even a rudimentary due diligence investigation would indicate raised serious red flags.

20.     The Company's failures were made possible by AmerisourceBergen's knowingly deficient programs for controlling or monitoring the diversion of controlled substances into illicit channels.

21.     ████████████████████████████████████████ █████████
████████████████████████████████████████████████████
█████████████████████████████████

22.     Government agencies repeatedly warned AmerisourceBergen about its deficient internal controls, and yet the Company failed to take steps to cure the deficiencies. This conscious failure to adequately monitor and report suspicious orders directly contributed to the widespread opioid epidemic. Meanwhile, AmerisourceBergen grew to be one of the world's largest suppliers of opioid drugs.

23.     During this time, the Board was presented with crucial information detailing the Company's non-compliance with the controlled substances laws. One such alert was the *June 2007*

---

5 ████████████████████████████████████████████████████
████████

*settlement agreement* AmerisourceBergen entered into with the U.S. Drug Enforcement Administration ("**DEA**").

24.     In 2007, the DEA suspended the Company's license to send controlled substances from one of its distribution centers in Orlando, Florida. The DEA asserted that the Company had failed to maintain effective internal controls over shipments of prescription opioids, leading to diversion of millions of dosage units of its drugs. As the DEA charged at the time, "continued registration of this company constitutes an imminent danger to public health and safety."

25.     To settle the charges brought by the government, AmerisourceBergen agreed to implement an enhanced order monitoring program in all of its distribution centers to improve its failing anti-diversion controls. This program was critical to the Company's ability to maintain regulatory compliance and continue to operate as a drug distributor. As detailed below, *three* of the Company's current directors were on the Board at the time of the settlement with the DEA, and a fourth director – Collis, now the Company's CEO and Chair – was a high-ranking corporate officer at the time.

26.     Later in 2007, AmerisourceBergen resolved similar claims relating to problems at Bellco Health ("**Bellco**"), a pharmaceuticals distributor that AmerisourceBergen acquired that year. Bellco entered into a consent decree with the DEA "for failing to report suspicious orders of controlled substances to …. pharmacies." Bellco paid an $800,000 fine and surrendered its DEA license.

27.     The 2007 settlements proved to be of no moment, and the Company went about continuing to illegally distribute opioids. The public inevitably became shocked by the suffocating death toll, and large distribution companies such as AmerisourceBergen came under intense scrutiny. In 2012, federal and state prosecutors began investigating the Company over concerns

about its ineffective anti-diversion programs. U.S. Attorney's Offices for Colorado, Florida, Kansas, Michigan, New Jersey, New York, Ohio, and West Virginia each issued subpoenas investigating the Company's diversion control and order monitoring programs. Congress began its own investigation, even calling for the Company's CEO, defendant Collis, to testify before the U.S. House of Representatives Energy and Commerce Committee. In addition, the Attorney General of the state of West Virginia filed a lawsuit in 2012 against AmerisourceBergen alleging the Company knowingly violated controlled substances laws in the state.

28.     Nearly a decade after its 2007 settlement with the DEA, AmerisourceBergen once again settled charges over its unlawful distribution practices. Consequently, in January 2017, the Company settled the State of West Virginia's allegations for $16 million and entered into an agreement to adhere to stricter reporting guidelines. Yet, the same ineffective oversight continued.

29.     As a direct result of the Company's years-long failure to implement an adequate diversion control program, AmerisourceBergen is now defending thousands of lawsuits filed on behalf of victims of the opioid scourge. In addition, two thousand cities, counties, municipalities, tribal authorities, and virtually every state's Attorney General have alleged that drug companies, including AmerisourceBergen, fueled the nation's opioid crisis to line their own pockets at the expense of the American public. AmerisourceBergen already has spent more than $1 billion defending opioid-related lawsuits.

30.     At the same time, federal opioid cases have been consolidated for multi-district litigation ("**MDL**") in the U.S. District Court for the Northern District of Ohio and continue to advance to trial. Recently, AmerisourceBergen, along with other wholesale distributors and manufacturers, agreed to pay $215 million to two Ohio counties to avoid the first federal opioid "bellwether trial" scheduled to begin in connection with the MDL. Analysts have estimated that a

global settlement could cost the wrongdoers as much as $100 billion. As the second-largest drug distributor in the United States, AmerisourceBergen's exposure is easily tens of billions of dollars.

31.     Notwithstanding the Company's unlawful and indifferent drug distribution practices, on January 19, 2018, certain of the Individual Defendants (defined below) issued a materially false and misleading Proxy Statement on Form DEF 14A (the "**2018 Proxy**") urging stockholders to reelect certain directors and to reject two stockholder proposals that proposed improved internal controls to mitigate AmerisourceBergen's role in the continuing the opioid epidemic. The 2018 Proxy gave false and misleading assurances to AmerisourceBergen stockholders that the Board acted in accordance with the Company's Code of Ethics and Business Conduct and Corporate Governance Principles and "actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse." In truth, the Board utterly failed in its duties of oversight by allowing the Company to engage in unlawful opioid distribution and failed to adequately address the Company's insufficient internal controls.

## JURISDICTION AND VENUE

32.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), this Court has jurisdiction over Plaintiff's claims for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

33.     This Court has jurisdiction over each defendant named herein because each of them is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

34.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) AmerisourceBergen is incorporated in the State of Delaware in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AmerisourceBergen, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

35.     Plaintiff is a current AmerisourceBergen stockholder, was a stockholder of AmerisourceBergen at the time of the wrongdoing complained of, and has continuously held shares of AmerisourceBergen common stock since 2003.

**Nominal Defendant**

36.     Nominal defendant AmerisourceBergen is a Delaware corporation. AmerisourceBergen is the second largest pharmaceutical distribution company in the United States and is currently ranked #10 on the *Fortune 500*. The Company distributes pharmaceuticals, over-the-counter healthcare products, home healthcare supplies and equipment, outsourced compounded sterile preparations, and related services to various healthcare providers. As of September 30, 2019, the Company had approximately 22,000 employees.

**Defendants**

37.     Defendant Ornella Barra ("**Barra**") has been an AmerisourceBergen director since January 2015. She has been a member of the Company's Compliance and Risk Committee since

11

December 2019. She has been Co-Chief Operating Officer of Walgreens Boots Alliance, Inc. since June 2016. Walgreens Boots Alliance, Inc. owns approximately 27% of the Company's issued and outstanding common stock and is the Company's largest purchaser of opioids. Barra is Walgreens Boots Alliance's designee on the Company's Board. The Company concedes that defendant Barra is not independent.

38.     Defendant Collis is the Company's President and Chief Executive Officer and has served in this position since July 2011. The Company concedes that defendant Collis is not independent. He has been a member of the Board since 2011 and has served as the Board's Chairman since March 2016. From November 2010 to July 2011, defendant Collis served as the Company's President and Chief Operating Officer. He served as Executive Vice President and President of the Company's subsidiary, AmerisourceBergen Drug Corporation, from September 2009 to November 2010, as Executive Vice President and President of the Company's subsidiary, AmerisourceBergen Specialty Group, from September 2007 to September 2009 and as Senior Vice President of the Company and President of its subsidiary, AmerisourceBergen Specialty Group, from August 2001 to September 2007. Defendant Collis has held a variety of other positions with the Company and its predecessors since 1994. AmerisourceBergen has paid defendant Collis the following compensation since 2012:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2019 | $1,240,000 | $5,600,004 | $2,400,404 | $1,866,596 | $202,926 | $11,309,390 |
| 2018 | $1,240,000 | $5,599,992 | $2,400,007 | $2,050,733 | $223,383 | $11,514,115 |
| 2017 | $1,240,000 | $4,199,984 | $2,799,999 | $1,339,883 | $327,408 | $9,907,274 |
| 2016 | $1,234,231 | $4,019,981 | $2,680,003 | $1,330,783 | $713,178 | $9,978,176 |
| 2015 | $1,190,000 | $4,019,982 | $2,679,998 | $2,447,342 | $463,504 | $10,800,826 |
| 2014 | $1,185,962 | $4,020,021 | $2,679,998 | $1,859,697 | $157,307 | $9,902,985 |
| 2013 | $1,155,000 | $7,710,338 | $1,675,899 | $1,314,978 | $143,991 | $12,000,206 |

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2012 | $1,093,462 | $2,699,983 | $1,800,015 | $1,348,150 | $115,012 | $7,056,622 |

39.    Defendant Douglas R. Conant ("**Conant**") was a director from January 2013 to February 2019. He was a member of the Company's Governance and Nominating Committee from at least January 2016 to February 2019. AmerisourceBergen paid defendant Conant the following compensation:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|-------------|------|--------------|------------------------|-------|
| 2019 | $50,000 | - | $6,320 | $56,320 |
| 2018 | $100,000 | $125,022 | $5,017 | $230,039 |
| 2017 | $100,000 | $125,038 | $6,763 | $231,801 |
| 2016 | $100,000 | $125,000 | $8,474 | $233,474 |
| 2015 | $100,000 | $125,000 | - | $225,000 |
| 2014 | $100,000 | $125,000 | - | $225,000 |
| 2013 | $75,000 | $125,000 | - | $200,000 |

40.    Defendant Charles H. Cotros ("**Cotros**") was an AmerisourceBergen director from January 2002 to February 2013. AmerisourceBergen paid defendant Cotros the following compensation as a director since 2012 until he left the Board:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|-------------|------|--------------|------------------------|-------|
| 2013 | $47,917 | - | $1,058 | $48,975 |
| 2012 | $97,250 | $137,500 | $20,794 | $255,544 |

41.    Defendant D. Mark Durcan ("**Durcan**") has been an AmerisourceBergen director since September 2015. He has been the Chair of the Company's Audit Committee since at least December 2019 and a member of that committee since January 2016. AmerisourceBergen paid defendant Durcan the following compensation since 2015:

13

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $100,000 | $175,000 | $6,320 | $281,320 |
| 2018 | $100,000 | $125,022 | - | $225,022 |
| 2017 | $100,000 | $125,038 | - | $225,038 |
| 2016 | $106,250 | $125,000 | - | $231,250 |
| 2015 | $6,250 | - | - | $6,250 |

42.     Defendant Richard W. Gochnauer ("**Gochnauer**") has been a director since September 2008. He was a member of the Company's Governance and Nominating Committee from at least January 2012 to at least January 2018; and a member of the Audit Committee from at least January 2012 to at least January 2013. AmerisourceBergen paid defendant Gochnauer the following compensation since 2012:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $113,750 | $175,000 | $6,320 | $295,070 |
| 2018 | $110,000 | $125,022 | - | $235,022 |
| 2017 | $110,000 | $125,038 | - | $235,038 |
| 2016 | $110,000 | $125,000 | $8,474 | $243,474 |
| 2015 | $105,000 | $125,000 | $9,497 | $239,497 |
| 2014 | $100,000 | $125,000 | $4,040 | $229,040 |
| 2013 | $100,000 | $125,000 | $3,938 | $228,938 |
| 2012 | $85,500 | $137,500 | $3,987 | $226,987 |

43.     Defendant Richard C. Gozon ("**Gozon**") was AmerisourceBergen's Chairman of the Board from February 2006 to March 2016, and a director from August 2001 to March 2016. AmerisourceBergen paid Gozon the following compensation from 2012 until he left the Board:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $75,000 | - | $11,866 | $86,866 |
| 2015 | $150,000 | $175,000 | $25,418 | $350,418 |
| 2014 | $150,000 | $175,000 | - | $325,000 |
| 2013 | $150,000 | $175,000 | - | $325,000 |
| 2012 | $140,250 | $175,000 | - | $315,250 |

44.     Defendant Lon R. Greenberg ("**Greenberg**") has been a director since May 2013. He has been a member of the Company's Audit Committee since at least January 2014 and the Chair of the Compliance and Risk Committee since December 2019. He was also the Chair of the Company's Audit Committee from at least January 2018 to at least January 2019. AmerisourceBergen paid defendant Greenberg the following compensation since 2013:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $123,750 | $175,000 | - | $298,750 |
| 2018 | $120,000 | $125,022 | - | $245,022 |
| 2017 | $110,000 | $125,038 | $6,763 | $241,801 |
| 2016 | $100,000 | $125,000 | - | $225,000 |
| 2015 | $100,000 | $125,000 | - | $225,000 |
| 2014 | $100,000 | $125,000 | - | $225,000 |
| 2013 | $37,637 | - | - | $37,637 |

45.     Defendant Edward E. Hagenlocker ("**Hagenlocker**") was an AmerisourceBergen director from August 2001 to September 2015. He was a member of the Company's Governance and Nominating Committee from at least January 2012 to at least January 2014. AmerisourceBergen paid defendant Hagenlocker the following compensation from 2012 until he left the Board:

| Fiscal Year | Fees Earned | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2015 | $55,000 | - | $8,780 | $63,780 |
| 2014 | $110,000 | $125,000 | - | $235,000 |
| 2013 | $110,000 | $125,000 | - | $235,000 |
| 2012 | $103,000 | $125,000 | - | $228,000 |

46.     Defendant Jane E. Henney ("**Henney**") has been the Company's Lead Independent Director since March 2016 and a director since January 2002. She has served ex officio on the Company's Audit Committee since at least March 2017. She also served as Chair of the Governance and Nominating Committee from at least January 2012 to at least January 2017 and served *ex officio*

on that committee from at least January 2018 to at least January 2019. She is also a member of the Company's Compensation & Succession Planning Committee, Finance Committee, Executive Committee, and Compliance and Risk Committee. AmerisourceBergen has paid defendant Henney the following compensation since 2012:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $125,000 | $200,000 | $7,852 | $332,582 |
| 2018 | $125,000 | $150,026 | $5,017 | $280,043 |
| 2017 | $130,000 | $149,954 | $6,763 | $286,717 |
| 2016 | $124,583 | $150,000 | $8,474 | $283,057 |
| 2015 | $110,000 | $125,000 | $21,461 | $256,461 |
| 2014 | $110,000 | $125,000 | $24,485 | $259,485 |
| 2013 | $110,000 | $125,000 | $12,289 | $247,289 |
| 2012 | $91,500 | $137,500 | $11,789 | $240,789 |

47.    Defendant Kathleen W. Hyle ("**Hyle**") has been a director since May 2010. She has been a member of the Company's Compliance and Risk Committee since December 2019. She was also a member of the Company's Audit Committee from at least January 2012 to at least January 2018 and was the Chair of that committee from at least January 2012 to at least January 2017. AmerisourceBergen paid defendant Hyle the following compensation since 2012:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $100,000 | $175,000 | $6,320 | $281,320 |
| 2018 | $100,000 | $125,022 | $5,017 | $230,039 |
| 2017 | $110,000 | $125,038 | $6,763 | $241,801 |
| 2016 | $120,000 | $125,000 | $8,474 | $253,474 |
| 2015 | $120,000 | $125,000 | $9,497 | $254,497 |
| 2014 | $120,000 | $125,000 | $4,040 | $249,040 |
| 2013 | $120,000 | $125,000 | $4,668 | $249,668 |
| 2012 | $61,000 | $182,500 | - | $243,500 |

48.    Defendant Michael J. Long ("**Long**") has been a director since May 2006. He has been a member of the Company's Governance and Nominating Committee since at least January

2019. He was a member of the Audit Committee from at least January 2012 to at least January 2018. AmerisourceBergen paid defendant Long the following compensation since 2012:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $118,750 | $175,000 | $6,320 | $300,070 |
| 2018 | $115,024 | $125,022 | $5,017 | $245,063 |
| 2017 | $115,072 | $125,038 | $6,763 | $246,873 |
| 2016 | $115,000 | $125,000 | $8,474 | $248,474 |
| 2015 | $115,000 | $125,000 | $9,497 | $249,497 |
| 2014 | $115,000 | $125,000 | $4,040 | $244,040 |
| 2013 | $108,750 | $125,000 | $3,938 | $237,688 |
| 2012 | $9,000 | $212,500 | $4,561 | $226,061 |

49.     Defendant Henry W. McGee ("**McGee**") has been a director since November 2004. Defendant McGee has been Chair of the Company's Governance and Nominating Committee since at least January 2018 and a member of that committee since at least January 2012. He is a member of the Audit Committee and was also a member from at least January 2012 to at least January 2015. AmerisourceBergen paid defendant McGee the following compensation since 2012:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $113,750 | $175,000 | $17,197 | $305,947 |
| 2018 | $110,000 | $125,022 | $25,441 | $260,463 |
| 2017 | $105,000 | $125,038 | $17,933 | $247,971 |
| 2016 | $100,000 | $125,000 | $20,336 | $245,336 |
| 2015 | $100,000 | $125,000 | $4,945 | $229,945 |
| 2014 | $100,000 | $125,000 | $5,289 | $230,289 |
| 2013 | $100,000 | $125,000 | $11,912 | $236,912 |
| 2012 | $84,000 | $137,500 | - | $221,500 |

50.     Defendants Barra, Collis, Conant, Cotros, Durcan, Gochnauer, Gozon, Greenberg, Hagenlocker, Henney, Hyle, McGee and Long are referred to as the "**Director Defendants**." Defendants Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee are referred to as the "**Audit Committee Defendants**." Defendants Conant, Gochnauer, Hagenlocker, Henney, Long,

and McGee are referred to as the "**Governance & Nominating Committee Defendants.**" All together, the Director Defendants, Audit Committee Defendants, and Governance & Nominating Committee Defendants are collectively referred to as the "**Individual Defendants**."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

51.     As officers and directors of the Company, each of the Individual Defendants owes AmerisourceBergen and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and must use their utmost ability to control and manage AmerisourceBergen in a fair, just, honest, and equitable manner. The Individual Defendants must act in furtherance of the best interests of AmerisourceBergen and not in furtherance of their personal interest or benefit.

52.     To discharge their duties, the Individual Defendants must, among other things, exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. This includes:

(a)     ensuring that the Company operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

(b)     ensuring that the Company complied with its legal obligations and requirements and refrained from engaging in deceptive conduct;

(c)     conducting the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations to maximize performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock; and

(d)     remaining informed of how AmerisourceBergen conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, making

reasonable inquiry and taking steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

53.     AmerisourceBergen has implemented policies and obligations to hold its fiduciaries to specific corporate governance principles beyond the requirements of law. The Company has Corporate Governance Principles setting forth the Board's duties and active oversight role.[6] The Corporate Governance Principles state that the Board must "oversee management and [] assure that the long-term interests of the stockholders are being served." The Board also has responsibility for assessing major risks facing the Company as well as ensuring processes are in place for maintaining the integrity of the Company. In particular, the Corporate Governance Principles state:

> The Board provides independent risk oversight with a focus on the most significant risks facing the Company, including strategic, operational and reputational risks. Examples of such risks include … reputational risks related to the opioid crisis.
>
> * * *
>
> In addition to its general oversight of management, the Board also performs a number of specific functions, including:
>
> * * *
>
> c. reviewing, approving and monitoring fundamental financial and business strategies and major corporate actions;
>
> * * *
>
> e. assessing major risks facing the Company and reviewing options for their mitigation, including oversight of the Company's policies and procedures for assessing and managing risk; and
>
> f. ensuring processes are in place for maintaining the integrity of the Company – the integrity of the financial statements, the integrity of compliance with law and ethics, the integrity of relationships with customers and suppliers, and the integrity of relationships with shareholders.

---

[6] https://s24.q4cdn.com/386340686/files/doc_downloads/policies/2019/Governance-Principles-(FINAL-12.1.19).pdf (last accessed June 22, 2020).

54.     The Individual Defendants, as officers and directors of the Company, were also bound by its Code of Ethics and Business Conduct[7] and Code of Ethics for Designated Senior Officers[8] (collectively, the "**Code**"). At all relevant times, the Code set out basic principles, as well as applicable laws and regulations, guiding the conduct of the Company's directors, officers and employees. Among other things, the Code requires the Company's directors, officers, and employees to "comply with all federal, state and local laws, regulations and rules."

**Additional Duties of the Audit Committee Defendants**

55.     Under the Audit Committee Charter in effect since October 2003, the Audit Committee Defendants owed additional duties to AmerisourceBergen to assist the Board in overseeing "the Company's compliance with legal and regulatory requirements and performance of the Company's internal audit function and independent auditor." Moreover, the Audit Committee's Charter provided at all relevant times that the Audit Committee must:

> Discuss with management and the independent auditor any correspondence from regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.
>
> * * *
>
> Discuss the Company's guidelines, policies and practices with respect to risk assessment and risk management, including financial reporting risks.
>
> * * *
>
> Obtain reports from management, including the Company's Chief Compliance Officer and/or the Company's counsel regarding the Company's compliance with applicable legal requirements and the Company's Code of Ethics and Business Conduct.

---

[7] https://s24.q4cdn.com/386340686/files/doc_downloads/policies/ABC_CodeofEthics_2019.pdf (last accessed June 22, 2020).

[8] https://s24.q4cdn.com/386340686/files/doc_downloads/policies/Code-of-Ethics-for-Designated-Senior-Officers.pdf (last accessed June 22, 2020).

**Additional Duties of the Governance & Nominating Committee Defendants**

56.     Under the Governance and Nominating Committee Charter in effect since October 2003, [9] the Governance & Nominating Committee Defendants owed additional duties to AmerisourceBergen to assist the Board to "exercise general oversight with respect to governance of the Board[.]" Moreover the Governance and Nominating Committee's Charter provided at all relevant times that the Governance and Nominating Committee must:

>    2.     Review and make corporate governance recommendations to the Board, including to:
>
>    a.     Annually review and consider whether to recommend, for adoption by the Board, any changes to the Corporate Governance Principles, including as needed for compliance with applicable laws, regulations and NYSE listing standards.
>
>    * * *
>
>    d.     Review all proposals submitted by stockholders for inclusion in the Company's annual proxy statement and results of stockholder advisory votes and recommend to the Board how to respond to such proposals and advisory votes.
>
>    e.     Identify and discuss with management the risks, if any, relating to the Company's corporate governance structure and practices.
>
>    f.     Review trends and issues related to corporate governance and related matters.

**Breaches of Duties**

57.     The Individual Defendants knowingly and culpably violated their obligations as officers and directors of AmerisourceBergen. As set forth in greater detail below, the Individual Defendants' actions resulted in the Company systematically filling facially suspicious opioid orders and failing to report suspicious orders as required by the laws governing controlled substances.

---

[9] https://s24.q4cdn.com/386340686/files/doc_downloads/committees_documents/Governance-Committee-Charter-(November-2018)-(002).pdf (last accessed June 22, 2020).

58.     The Individual Defendants breached their duty of loyalty and good faith by causing, allowing their fellow defendants to cause, or failing to prevent their fellow defendants from causing the Company to engage in the improper practices that resulted in substantial damage to the Company.

59.     As officers or directors of AmerisourceBergen, the Individual Defendants exercised control over the wrongful acts complained of herein and failed to prevent their fellow defendants from committing such wrongful acts, which have caused the Company to incur substantial damage.

## THE REGULATORY FRAMEWORK GOVERNING OPIOID DISTRIBUTION

**Congress Enacts the Controlled Substances Act to Address Drug Abuse in the United States**

60.     AmerisourceBergen is one of the largest and most important players in the U.S. pharmaceutical industry, a complex system made up of drug manufacturers, wholesale distributors who support the supply chain, and pharmacies who ultimately fill healthcare providers' and doctors' prescriptions for patients. Each step of the process is highly regulated by federal and state authorities.

61.     Pharmaceutical distributors like AmerisourceBergen sustain the supply chain and serve as a vital link in the healthcare system between manufacturers and healthcare providers to help ensure patients get the medicines they need when they need them. As a pharmaceutical distributor, AmerisourceBergen buys prescription drugs from manufacturers for storage in warehouses ████████████████████████████████████████████. Once pharmacies and other healthcare providers place orders with one of AmerisourceBergen's distributor centers for the medicines they need, AmerisourceBergen processes and delivers the order.

62.     As explained by Frank Younker, a retired DEA supervisor with over 30 years of experience, distributors of controlled substances are the linchpin of the industry: "The distributors

are important. They're like the quarterback. They distribute the ball." AmerisourceBergen is the

second-largest drug distributor and currently ranks #10 on the *Fortune 500*.[10] As the second-largest

wholesale distributor of pharmaceuticals, AmerisourceBergen must comply with federal laws and

with the laws and regulations that are in place specifically due to the importance of preventing drugs

from falling into the black market.

63.     AmerisourceBergen's officers and directors knew the Company must comply with

the Controlled Substances Act, among other laws, in order to stay in business. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

64.     Enacted in 1970, the Controlled Substances Act established the framework and

principle that certain types of drugs were subject to national regulation. The CSA recognized that

while "[m]any of the drugs included within this title have a useful and legitimate medical purpose

and are necessary to maintain the health and general welfare of the American public[,]" the illicit

traffic and use of controlled substances has "a substantial and detrimental effect on the health and

general welfare of the American people."

65.     Accordingly, the CSA sought to promote public health by making medication

available to patients while simultaneously protecting public safety by curbing illicit diversion. As

described in Section 309 of the Uniform Controlled Substances Act, diversion means "the transfer

of a controlled substances from a lawful to an unlawful channel of distribution or use." The

diversion of pharmaceutical controlled substances can occur in a number of ways, including, but

not limited to: prescriptions written for other than a legitimate medical purpose; pharmaceutical

---

[10] https://fortune.com/fortune500/ (last accessed June 18, 2020).

controlled substances stolen by pharmacy personnel; and pharmacists not exercising their coordinating responsibility to ensure that prescriptions are valid.

66.     The CSA seeks to prevent the diversion of controlled substances into illicit markets by establishing a closed system of distribution. As a distributor in this closed system, AmerisourceBergen is required by the CSA to register with the DEA to engage in commercial distribution of certain controlled substances. 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.

67.     The DEA is charged with administrating the CSA and observing AmerisourceBergen's facilities to ensure that the Company's operations are "consistent with the public interest." 21 U.S.C. § 824(a)(4); 28 C.F.R. § 0.100; 21 C.F.R. § 1301.71. In evaluating whether the Company's operations satisfy its legal obligations to serve the "public interests," the DEA considers: (1) whether AmerisourceBergen has maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels"; (2) whether AmerisourceBergen has complied with applicable state and local laws; (3) whether AmerisourceBergen has previously been convicted under federal or state laws for a crime related to the sale of controlled substances; (4) AmerisourceBergen's past experience with controlled substances; and (5) "such other factors as may be relevant to and consistent with the public health and safety." 21 U.S.C. § 823(b), (e). The DEA is "not required to make findings as to all of the[se] factors," and "may give each factor the weight [it] deems appropriate." If AmerisourceBergen's operations fail to meet the public-interest standard, the DEA may suspend or even permanently revoke the Company's registration. 21 U.S.C. § 824(a)(4). Under the CSA, the DEA is also authorized to immediately suspend any DEA registration and keep that registration suspended during the pendency of administrative revocation proceedings, where it finds that there is an "imminent danger to the public health or safety." 21 U.S.C. § 824(d) (2012); 21 C.F.R. §

1301.36(e) (2017). Prior to 2016, "imminent danger" was undefined, but the DEA routinely identified "imminent dangers" where a registrant failed to put in place sufficient controlled substances diversion prevention systems. As set forth in greater detail below, AmerisourceBergen has spent millions of dollars lobbying Congress to weaken the DEA's ability to suspend registrants under this provision.

68.    Significantly, the CSA required AmerisourceBergen to put in place "effective control[s] against the diversion" (21 C.F.R. § 1301.71(a)). Thus, the DEA demands that AmerisourceBergen "design and operate a system" to identify "suspicious orders of controlled substances" and report those orders to DEA. 21 C.F.R. § 1301.74(b). "Suspicious orders" are defined by the DEA as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b). Courts have interpreted Section 1301.74(b) to be an illustrative list rather than an exclusive list of examples of suspicious orders, and thus, distributors like AmerisourceBergen must use their independent judgment to identify unusual orders.

69.    Should AmerisourceBergen fail to live up to its obligations under the CSA, the DEA may impose a civil penalty of up to $10,000 for *each* violation of the reporting requirement. 21 C.F.R. § 842(c)(1)(B).

70.    The Company's obligation to report "suspicious orders" is not onerous. It merely requires that AmerisourceBergen provide basic information about certain orders to DEA, so that DEA "investigators in the field" can aggregate reports from every point along the legally regulated supply chain and use the information to ferret out "potential illegal activity."

**The Rise of Prescription Opioids**

71.     Prescription opioids are powerful drugs to treat pain that are derived from the opium poppy plant. While often very effective, prescription opioids are also very addictive. Most patients receiving more than a few weeks of opioid therapy will experience prolonged withdrawal symptoms. Patients often develop a tolerance to opioids and require ever-higher doses in order to obtain the same relief, increasing the risks of withdrawal, addiction, and overdose. Because they are so susceptible to addiction and abuse, opioids are categorized as "Schedule II Controlled Substances."

72.     Because of these dangers, doctors have historically prescribed opioids only for short-term acute pain—where brief use limited the need for escalating doses and the risk of addiction was minimal—and for terminal illnesses and end-of-life care. These limited uses meant that the market for prescription opioids was historically limited. This is not the case today. Today, opioids are the most prescribed class of drugs in the United States.

73.     The roots of the opioid epidemic date back to the mid-1990s when opioid manufacturers, such as Purdue Pharma, Johnson & Johnson, Teva Pharmaceutical Industries and others, set out to enlarge the narrow opioid patient profile by reversing the traditional understanding of opioid use.

74.     To convince doctors to prescribe more opioids to a more people, opioid manufacturers executed massive, concerted, and unprecedented marketing campaigns that minimized the risks and exaggerated the benefits of long-term opioid use to treat a wide range of conditions. Among other things, opioid manufacturers: (i) deceptively promised that long-term opioid use would improve patients' function and quality of life; (ii) trivialized or obscured the serious risks and adverse outcomes, including the risk of addiction, overdose, and death, associated

with opioid use; (iii) overstated the effectiveness of opioids compared with other treatments; and (iv) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms. Opioid manufacturers also deceptively marketed opioids for indications and benefits that were outside of the drugs' FDA-approved purposes, an unlawful practice called off-label marketing.

75.     Opioid manufacturers' marketing and promotional efforts included, among other things, disseminating favorable "educational" materials, advertising in print and online, sponsoring continuing medical education courses, and hiring "key opinion leaders" to act as consultants, lecturers, and influencers. These efforts were meant to increase the market for opioids by changing doctors' behavior so that they would prescribe opioids for chronic non-cancer pain, including for off-label use.

76.     Opioid manufacturers' deceptive marketing schemes were overwhelmingly successful, resulting in a dramatic shift in the public and medical opinion about the use of opioids. Between 2000 and 2011, sales of prescription opioids in the U.S. quadrupled. In 2012, healthcare providers wrote 259 million prescriptions for opioid painkillers—enough to medicate every adult in America around the clock for one month. Opioids, once a niche drug, became the most prescribed class of drugs in the United States.

**A Public Health Emergency**

77.     It should have been obvious that opioids were being overprescribed. Over the past two decades, opioid overdoses resulting from over-prescription have killed more than 200,000 people. Millions of Americans continue to suffer daily from opioid addiction. As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and the present, the life

expectancy for Americans has decreased for the first time in recorded history. Drug overdoses are now the leading cause of death for Americans under fifty years old.

78.     In May 2010, the Obama administration released its inaugural National Drug Control Strategy, which stated that "[p]rescription drug abuse is the Nation's fastest-growing drug problem," and recognized that "opiate overdoses, once almost always due to heroin use, are now increasingly due to abuse of prescription painkillers." In July 2016, Congress passed, and President Obama signed, the Comprehensive Addiction and Recovery Act of 2016, which authorized $181 million in additional annual funding for initiatives aimed at addressing the opioid crisis.

79.     An internal AmerisourceBergen presentation in 2017 acknowledged the undeniable fact that "the statistics overwhelmingly demonstrate that we have an opioid epidemic in the U.S., and tragically people are dying." In that same presentation, AmerisourceBergen described how on the *average day* more than 650,000 opioid prescriptions are dispensed, 3,900 people initiate the non-medical use of prescription opioids, and acknowledged that "prescription painkillers are now more widely used than tobacco."[11]

80.     In October 2017, President Trump declared the American opioid epidemic a public health emergency. According to the *New York Times*, "[p]ublic health officials have called the current opioid epidemic the worst drug crisis in American history."

**The Legal Duty to Prevent Opioid Diversion**

81.     Given the dangerous risks of opioids, Congress sought to ensure their safe distribution by heavily regulating their sale, marketing, and use. As a pharmaceutical distributor, AmerisourceBergen was required to operate in accordance with the statutory provisions of the CSA.

---

[11] *State of Oklahoma v. AmerisourceBergen Corp. et al.*, Case No. CJ-2020-85 (Bryan Co., Okla. Dist. Ct.) at ¶ 49.

Under these laws, Congress developed a closed distribution system to track and account for controlled substances from the manufacturer to the end consumer. Specifically, drug manufacturers could not sell controlled substances directly to physicians or pharmacies. Rather, controlled substances could be distributed only by distributors like AmerisourceBergen, thereby enhancing the importance that such distributors comply with applicable law and regulations. As such, the law imposed strict controls and requirements throughout the prescription opioid distribution chain, from manufacturer to patient.

82.     Chapters II and III of the CSA require distributors, manufacturers, and others that handle controlled substances (collectively known as "**Registrants**"), to register with the DEA. Registrants must: (i) limit sales within a quota set by the DEA for the overall production of Schedule II substances like opioids; (ii) maintain effective controls against diversion of the controlled substances; and (iii) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

83.     Among other things, Registrants must identify and report red flags such as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency" and "[o]rdering the same controlled substance from multiple distributors."[12] Moreover, registrants' responsibilities do not end with the products they distribute or manufacture. When registrants obtain information about the suspicious sales and distribution of other companies' opioid products, they are legally obligated to report that activity to the DEA. Registrants that violate the CSA may be subject to DEA administrative enforcement actions, civil penalties, or criminal prosecution by the U.S. Department of Justice.

---

[12] 21 C.F.R. §1301.74(b).

84.     This closed system thus imposes specific duties upon wholesale distributors to monitor, identify, halt, and report suspicious orders of controlled substances. Registrants like AmerisourceBergen must therefore actively prevent drug diversion through careful oversight of suspicious orders. Registrants must adhere to specific security, recordkeeping, monitoring, and reporting requirements that are designed to identify or prevent diversion of controlled substances. To do so and discharge their other duties under federal and state laws, Registrants must use highly advanced data collection and analytical systems to monitor the inventory and ordering needs of customers in real time.

85.     Failure to comply with these laws could result in the suspension or revocation by federal or state authorities of a Registrant's license to distribute pharmaceutical products, seizure or recall of the Registrant's products, and significant criminal, civil, and administrative sanctions. Any one of these results would have a significant adverse effect on the registrant's reputation, business, and results of operations.

86.     Cognizant of its legal obligations, AmerisourceBergen has publicly stated that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A Company spokeswoman also provided assurance that: "At AmerisourceBergen, we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."

## THE COMPANY ENGAGES IN A SUPPLY CHAIN SCHEME TO UNLAWFULLY INCREASE ITS REVENUE FROM OPIOID DISTRIBUTION

87.     AmerisourceBergen controls approximately one third of the total wholesale drug market. Three wholesaler distributors, AmerisourceBergen, Cardinal Health, Inc. ("**Cardinal Health**"), and McKesson Corporation ("**McKesson**"), consistently account for 85% to 90% of all wholesale revenues from pharmaceuticals distributed in the United States. AmerisourceBergen's revenue from pharmaceutical distribution has grown from approximately $50 billion in 2005 to over $172 billion in 2019. As such, the Company has profited immensely from the opioid epidemic.

88.     In doing so, AmerisourceBergen engaged in a nationwide scheme to exponentially expand a market that the law intended to restrict. In particular, the Company sold and distributed far more prescription opioids than they knew were needed for legitimate medical uses. AmerisourceBergen worked together with Cardinal Health, McKesson and other pharmaceutical distributors (collectively, the "**Opioid Distributors**") to vastly increase their profits at the expense of the American public.

### The Company's Role in the Unlawful Opioid Distribution Scheme

89.     Wholesale drug distributors like the Company buy pharmaceuticals from manufacturers and distribute the drugs to downstream customers like pharmacies, who distribute them to patients. Opioid Distributors acquire pharmaceuticals from manufacturers at an established wholesale acquisition cost. Discounts and rebates from this cost may be offered by manufacturers based on market share and volume. As a result, higher volumes may decrease the Opioid Distributors' costs per pill. Decreased costs per pill in turn allow the Opioid Distributors to offer more competitive prices, or, alternatively, pocket the difference as additional profit. As such, the Opioid Distributors have strong financial incentives to distribute higher volumes of opioids and to refrain from reporting or declining to fill suspicious orders.

90.     Together with trade and industry organizations such as the Pain Care Forum ("**PCF**") and Healthcare Distribution Alliance ("**HDA**"), the Opioid Distributors fraudulently increased the quotas that governed the manufacture and distribution of prescription opioids as described in greater detail below.

91.     The PCF is a coalition of drug makers, trade groups, and dozens of non-profit organizations supported by industry funding. In 2016, the Center for Public Integrity exposed that for more than a decade, lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids. In particular, the Center for Public Integrity and the Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[13]

92.     The exposé notes that PCF members spent over $740 million lobbying in Washington and in all 50 statehouses on an array of issues, including opioid-related measures. At all relevant times, AmerisourceBergen participated in the PCF, at a minimum through the pharmaceutical industry's trade association, the HDA, of which AmerisourceBergen was a member at all relevant times. Indeed, at a November 15, 2018 meeting,[14] the Board recognized the importance of the Company assuming a ███████████████████████████

███████████████████████████████████████

████████████████████

---

[13] https://publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic (last accessed June 16, 2020).

[14] ███████████████████████████████

███████████

93.     AmerisourceBergen, the PCF, and the HDA contributed substantial amounts of money to political campaigns, federal candidates, state candidates, political action committees and political parties.

94.     In a *60 Minutes* interview in October 2017, former DEA agent Joe Rannazzisi described the prescription opioid industry as "out of control," stating that "[w]hat they wanna do, is do what they wanna do, and not worry about what the law is. And if they don't follow the law in drug supply, people die. That's just it. People die." The interview continued:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen. They control probably 85 or 90 percent of the drugs going downstream.
>
> [INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping drugs into American communities that were killing people.
>
> JOE RANNAZZISI: That's not an implication, that's a fact. That's exactly what they did.

95.     Another DEA veteran similarly stated that these companies failed to make even a "good faith effort" to "do the right thing." He further explained that "I can tell you with 100 percent accuracy that we were in there on multiple occasions trying to get them to change their behavior. And they just flat out ignored us."

96.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

97.     Having misled Wall Street, AmerisourceBergen and the other Opioid Distributors continued to juice the demand for prescription opioids by disseminating false and misleading information to federal and state regulators claiming that they were complying with their obligations under the CSA. They also refrained from reporting suspicious orders to the DEA. At the same time as they controlled the flow of information, they called for the DEA to increase its distribution quotas for prescription opioids. With the limited information the Opioid Distributors provided to the DEA, it had no basis not to maintain artificially high production quotas, individual quotas, and procurement quotas.

98.     However, the Opioid Distributors are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers. Instead, they are each subject to various duties to report and monitor the quantity of Schedule II controlled substances in order to prevent oversupply and diversion into the illicit market. As DEA Registrants, the Opioid Distributors must discharge their duty to combat opioid diversion, including reporting suspicious orders of controlled substances and exercising due diligence to avoid filling suspicious orders. But they did not. The Opioid Distributors failed to design adequate suspicious order monitoring programs or report suspicious orders to the DEA and shipped orders that were, or should have been, flagged as suspicious. Accordingly, they failed to comply with their duties under the CSA.

**The Company Violates the CSA, Resulting in a 2007 Settlement Agreement with the DEA**

99.     The Company has a long history of failing to combat opioid diversion under the controlled substances laws.

100.     From 1990 to 2007, AmerisourceBergen's policy was to identify only "excessive" orders that exceeded a three-times threshold based on a given pharmacy's prior orders.

101.    This pre-2007 system did not take into consideration other relevant factors such as order frequency patterns, order averages of similar pharmacies, or comparisons of sales of Schedule II or III controlled substances with the sales of other controlled substances, all of which were considerations AmerisourceBergen and its directors knew, or should have known, should be taken into account. AmerisourceBergen also specifically failed to identify suspicious orders from internet pharmacies that the DEA concluded should have been identified. Other than an effort to make sure a customer was licensed with the state and registered with the DEA, AmerisourceBergen thus had no meaningful due diligence process in place to investigate whether orders other than those it deemed "excessive" qualified as suspicious.

102.    AmerisourceBergen further failed to report suspicious orders, shipped orders that were suspicious, and failed to perform meaningful due diligence. Prior to 2007, while certain orders that exceeded the three-times threshold were reported to the DEA, they were only reported *after* being shipped.

103.    Indeed, under the pre-2007 policy, AmerisourceBergen shipped *all* orders of controlled substances, regardless of size, frequency, deviations from prior orders, deviations from averages, deviations from defined thresholds, or whether the order was determined to be suspicious.

104.    AmerisourceBergen knew the consequences of failing to meet its obligations under the CSA. AmerisourceBergen's chief compliance officer, Chris Zimmerman, admitted at a deposition that if AmerisourceBergen did not adhere to "effective controls to prevent diversion, yes, diversion could occur." As set forth herein, AmerisourceBergen consistently ignored critical red flags and warning signs from its customers in what amounts to a structural breakdown of its diversion prevention obligations under the CSA, which had real consequences in the communities where AmerisourceBergen shipped dangerous drugs, like prescription opioids.

105.   The Company's filling and shipping of orders to pharmacies which AmerisourceBergen knew to be suspicious led to the DEA shutting down the Company's distribution center in Orlando, Florida on April 24, 2007. The DEA alleged that the Company failed to maintain effective controls over shipments of prescription opioids to Internet pharmacies. In particular, the DEA asserted that,

> "[i]n spite of being warned by DEA about the characteristics of rogue internet pharmacies, [the Orlando distribution center] distributed 3.8 million dosage units of hydrocodone [a common opioid] between January 1, 2006 and January 31, 2007 to [four] rogue pharmacies," and had not maintained effective controls against the diversion of hydrocodone. AmerisourceBergen had filled numerous opioid orders for over 100 times the amount of opioids that would be expected and normal for comparably sized pharmacies. In just thirteen months, the Company distributed large quantities of hydrocodone to the four rogue pharmacies, some of which were among its largest customers for the Orlando distribution center.

106.   Recognizing its duty to monitor sales of controlled substances and report suspicious orders to the DEA, on June 22, 2007, the Company announced that it had reached an agreement with the DEA whereby the Company would implement an enhanced order monitoring program in all AmerisourceBergen distribution centers by June 30, 2007 (the "**2007 Settlement**"). Under the 2007 Settlement, AmerisourceBergen agreed "to maintain a compliance program designed to detect and prevent diversion of controlled substances, which shall apply to the Orlando Facility and all other existing and future distribution centers of AmerisourceBergen in the United States and its territories and possessions, which AmerisourceBergen shall revise as appropriate." The Company also agreed to "a more rigorous examination process" for new customers. The Company also acknowledged that it was required to "inform DEA of suspicious orders as required by 21 C.F.R. §1301.74(b) in a format mutually and reasonably agreed upon by the Parties, except that AmerisourceBergen shall inform DEA Headquarters of suspicious orders, unless and until advised otherwise in writing by DEA Headquarters."

107.    As the Company announced at the time, "[t]he new order monitoring program requires more rapid identification and daily reporting of orders that may indicate diversion of controlled substances, including in some instances, halting the shipment of orders that require further investigation by the Company." The DEA required the Company to pass several inspections of the new program for reinstatement of the Company's license to become effective.

108.    The Company's public filings confirm the Board's significant role in monitoring and enforcing compliance. As stated in AmerisourceBergen's Proxy Statement on Form DEF 14A filed with the SEC on January 14, 2011 (the "**2011 Proxy**"), the "Chief Compliance Officer and/or Senior Vice President, General Counsel and Secretary report to the Audit Committee throughout the year on the status of our compliance program." As the Proxy Statement on Form DEF 14A filed with the SEC on January 18, 2019 (the "**2019 Proxy**") stated, "Our Board oversees risk management and considers specific risk topics on an ongoing basis, including risks associated with the Company's distribution of opioid medications.… Our Board of Directors actively oversees and reviews the effectiveness of our compliance programs, including our diversion control program."

**Despite the 2007 Settlement, the Company Continues Its Unlawful Opioid Distribution Practices**

109.    In response to heightened DEA scrutiny, in 2007 the HDA's membership, including AmerisourceBergen, began "developing a comprehensive DEA strategy," related to the identification of "suspicious orders."[15] The HDA's internal documents show that members were specifically concerned about the "surge in DEA enforcement around suspicious shipments" and felt the industry needed "to quickly develop a plan to deal with and work with the DEA as necessary."[16]

---

[15] *In Re: National Prescription Opiate Litigation,* 17-md-2804 (N.D. Ohio), Dkt. No. 1979-7, at 61-62 (HDA 30(b)(6) deposition).

[16] *Id.* at 68.

The HDA's members considered plans to "challenge the DEA" and "develop business practices" in response to the DEA's heightened scrutiny of suspicious shipments.[17] As part of this effort, the HDA collected copies of its "member companies' suspicious order policies and procedures."[18] HDA members then convened privately to discuss "best practices" in response to DEA enforcement and brainstorm "next steps."[19] In January 2008, as part of a monthly meeting with PCF, the HDA apprised PCF members, including opioid manufacturers and pharmacies, of the DEA's enforcement actions and the steps HDA was taking in response.[20] Thus, AmerisourceBergen was well aware of the need to implement more effective diversion control procedures, to protect the interests and welfare of both the Company and the American public.

110.    Even after 2007, however, AmerisourceBergen still failed to design and operate an adequate system to identify suspicious orders because it continued to employ a "threshold-based system," which was based on an arbitrary and antiquated three-times multiplier among drug families and which continued to ignore other relevant information as alleged above. Critically, AmerisourceBergen also left the identification of suspicious orders to the discretion of its distribution center employees without putting in place any concrete rules or criteria on how such orders should be identified. Accordingly, AmerisourceBergen failed to identify and grossly underreported suspicious orders.

111.    Further, while AmerisourceBergen purported to change its system in 2007 pursuant to its settlement agreement with the DEA, it still did not fully comply with the requirement not to

---

[17] *Id.* at 75-76.

[18] *Id.* at 121.

[19] *Id.* at 137.

[20] *Id.* at 139-140.

ship suspicious orders after that date. In some cases, even orders reported to the DEA were shipped anyway, rather than being held or cancelled.

112.    AmerisourceBergen shipped suspicious orders notwithstanding that it had access to "know your customer" questionnaires and files. This information, compiled in response to DEA comments in 2006 and 2007, was intended to help AmerisourceBergen identify suspicious orders or customers who were likely to divert prescription opioids. The "know your customer" questionnaires informed AmerisourceBergen of the number of pills that the pharmacies sold, how many non-controlled substances were sold compared to controlled substances, whether the pharmacy bought from other distributors, and the types of medical providers in the area (including pain clinics, general practitioners, hospice facilities, and cancer treatment facilities, among others). These questionnaires also put the recipients on notice of suspicious orders.

113.    Additionally, AmerisourceBergen purchased nationwide, regional, state, and local prescriber- and patient-level data from various data vendors that allowed it to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify "pill mills," etc. This data allowed AmerisourceBergen to view, analyze, compute, and track its competitors' sales and to compare and analyze market share information.[21]

114.    This information should have allowed AmerisourceBergen to track and identify instances of overprescribing. In fact, an expert for a data vendor testified that the data could be used to track, identify, report, and halt suspicious orders of controlled substances.[22]

---

[21] A data vendor representative testified that AmerisourceBergen and other Opioid Distributors use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 661712, *9-10 (Feb. 22, 2011).

[22] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of a data vendor, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." Joint Appendix in *Sorrell v. IMS Health*, No. 10-779, 2011 WL 687134, at *204 (Feb. 22, 2011).

115.    But rather than put these tools to use by implementing effective controls to prevent diversion or designing and operating a system to detect and stop suspicious orders, AmerisourceBergen circumvented legal requirements and coached customers on how to avoid being detected by the system and thereby becoming subject to an enforcement action by the DEA.

116.    For example, a July 2013 AmerisourceBergen document entitled "Sales Talking Points" warned an AmerisourceBergen customer that its "overall volume" and "percentage of C2 orders is high and may be deemed suspicious by either our OMP [Order Monitoring Program] system or regulatory authorities. ***This puts your account with ABDC at significant risk of closure or exposure to regulatory and enforcement agencies actions. Every day, we read about another independent pharmacy under investigation. I want to make sure that doesn't happen to you***." AmerisourceBergen then counseled the customer not to reduce its orders of controlled substances, but rather to strategically format their ordering patterns so that they would not get flagged by suspicious order monitoring ("**SOM**") systems or regulators.

117.    Unsurprisingly, a 2015 audit of AmerisourceBergen's SOM system cited numerous problems, including a lack of resources, a lack of formal training, overburdened workloads, crushing administrative demands, inconsistent policies, and communications breakdowns, all of which contributed to "gaps and risks" in AmerisourceBergen's ability to identify orders as suspicious and prevent diversion.

118.    ███████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

119.    The Board knew that the importance of the Company's order monitoring and diversion control programs cannot be overstated. █████████████████████████████

120.

121.

█████ U.S. Department of Health & Human Services Offices of Inspector General ("**OIG**")'s

23 ████████████████████████████████████████████

122. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

123.    As revealed in a report by the U.S. Senate Homeland Security & Governmental Affairs Committee issued on July 12, 2018, AmerisourceBergen and the other Opioid Distributors failed in their duties to combat opioid diversion under the controlled substances laws.

124.    As an example, the committee report detailed the role that AmerisourceBergen, McKesson, and Cardinal Health played in fueling the opioid epidemic in the state of Missouri, concluding that the three companies had "consistently failed to meet their reporting obligations" regarding suspicious orders. However, the scope of the companies' respective failures differed dramatically.  Between 2012 and 2017, AmerisourceBergen shipped approximately 650 million doses of opioids to Missouri, but only reported 224 suspicious orders to the DEA. In contrast,

McKesson shipped roughly the same volume of opioids to Missouri, yet reported 16,714 suspicious orders to the DEA – 75 times what AmerisourceBergen reported. During the same period, Cardinal Health shipped less than half the opioids shipped by the Company, but still reported 5,125 suspicious orders over the same five-year period – approximately 23 times what AmerisourceBergen reported. This data indicates, and the report concluded, that AmerisourceBergen's diversion control and order monitoring programs were ineffective – ██

██████████████████████

125.    An April 2019 amended complaint filed by the Attorney General of the state of New York against AmerisourceBergen and other defendants shows how the Company's broken diversion control and order monitoring programs fueled the opioid epidemic in New York. Indeed, the New York Attorney General noted that "[t]he one area in which [AmerisourceBergen] has consistently stood out as compared to its major competitors is its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion."

126.    Between 2010 and 2018, AmerisourceBergen sold nearly 275 million oxycodone pills in the State of New York to approximately 2,430 pharmacies. Despite the Company's purportedly effective controls governing suspicious opioid distribution and reporting, a number of these pharmacies demonstrated "several common indicators of suspicious activity," including:

- Scoring above the 90th percentile in a given New York county for opioid order volume;

- Scoring above the 90th percentile in the county for total opioid orders;

- Scoring above the 90th percentile in the county for total oxycodone orders;

- Scoring above the 90th percentile for percentage of oxycodone volume shipped of all controlled substances shipped;

- Filling prescriptions by prescribers who were later indicted or convicted on opioid-related prescribing and distribution charges;

- Scoring above the 90th percentile for percentage of doctor-shopper patients;

- Scoring above the 90th percentile for percentage of cash payments; and

- Scoring above the 90th percentile for median morphine milligram equivalent prescribed per day.

127.    The Company's flawed policies also led to inadequate due diligence investigations, despite the due diligence policy comprising two-thirds of its entire diversion control program.[24] Among other things, the due diligence investigation process for new customers did not include basic steps like simple news searches on a pharmacy's prescribing physicians. Simple news searches would have revealed that several of the prescribing physicians in New York had prior convictions for unlawful drug distribution. Another example of the Company's failure to institute a functioning compliance policy is the attempt in 2016 to validate that all customers authorized to purchase controlled substances actually have the required due diligence documentation in file.[25] The fact that the Company did not confirm that its customers actually had the required due diligence documentation on file alone is bad enough; one year into the project, despite having identified a significant percentage of customer files lacking the requisite due diligence, the Company had only collected information for about 10% of those files.[26] By May 2018, the Company estimated that

---

[24] *See* Manufacturers Defendants' Opposition to Plaintiffs' Motion for Partial Summary Adjudication on Defendants' Compliance with the Controlled Substances Act 46, *In re National Prescription Opiate Litigation*, No. 17-md-02804 (N.D. Ohio Aug. 12, 2019; ECF No. 2180).

[25] *See* Exhibit 301, Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Adjudication that Defendants Did Not Comply with Their Duties Under the Federal Controlled Substances Act to Report Suspicious Opioid Orders and Not Ship Them (corrected), *In re National Prescription Opiate Litigation*, No. 17-md-2804 (N.D. Ohio Dec. 18, 2019; ECF No. 3016-1).

[26] *Id.* at Exhibit 302 (ECF No. 3015-28).

only 60% of the due diligence deficiencies had been remedied.[27] Because AmerisourceBergen's diversion control program hinged on its prior due diligence, which was missing key information for a substantial portion of its customers, the diversion control program was built on a rotten foundation and was doomed to fail.

128.    AmerisourceBergen's sloppy procedures allowed for frequent threshold manipulation to avoid orders being held for review, rejected from shipment, or reported as suspicious. Indeed, the Company's order monitoring program was designed to use a complex, automated approach that, in essence, increases ordering flexibility for its customers rather than limits it and failed to identify "even orders of interest, much less suspicious orders. Examples of the frequent threshold manipulation include:

- In and around 2011, thresholds were set at 300% over the average purchasing for similarly sized pharmacies, ensuring that thresholds were only hit for orders that were *three times* the norm;

- Prior to 2012, the Company allowed customers to have multiple accounts associated with the same DEA number, each with its own corresponding threshold;

- During the same time period, customers had access to data on where their ordering stood against their threshold, allowing them to manipulate orders to keep under the limit, preemptively request an increase, and/or purchase those products from another provider.

129.    The New York Attorney General also described the Company's consistent reluctance to flag suspicious orders. When an order is flagged for review, AmerisourceBergen's "Diversion Control Team can make three possible adjudications: (1) reject the order and report it as suspicious to the DEA; (2) reject as an administrative error; or (3) release and process the order." However, "only a small percentage of orders flagged for review are cancelled, and even fewer are deemed suspicious." This is because the Company "has a high tolerance for compliance issues

---

[27] *Id.*

before it will terminate a customer," and "a regular practice of releasing and not reporting orders, even for customers that repeatedly and significantly exceed its established parameters."

130.    The Company even continued to supply pharmacies in New York that exhibited red flags, such as a high amount of cash payments, a high amount of total opioid orders, and "doctor-shopper" activity. Some of these pharmacies had 50 to 90 percent of their prescriptions filled by doctors who were indicted or convicted for illegally pushing opioids. Still, the Company failed to properly monitor or report the suspicious orders coming from these pharmacies. The New York Attorney General detailed three exemplar pharmacies as examples of the Company's defective diversion control and order monitoring programs:

- **Amerisource Exemplar Pharmacy 1**, located in Orange County (about 300,000 people), was consistently at or above both the 99th percentile in the State in terms of both number of opioid orders and total opioid weight. Between 2014 and 2016, more than 10% of its prescriptions were written by prescribers who were later indicted or convicted of opioid-related prescribing and distribution charges. And while Amerisource reported [REDACTED] SORs for this pharmacy in 2013 and [REDACTED] in 2014, that number dwindled to [REDACTED] over the next three years, and as of 2018, Amerisource was still serving as this pharmacy's primary opioid distributor.



46

- **Amerisource Exemplar Pharmacy 2**, located in Queens County, is a customer of Amerisource's Bellco Drug subdivision. Between 2013 and 2017, 77% of its prescriptions, on average, were written by prescribers who were later indicted or convicted, including Rogelio Lucas and Moshe Mirilashvili. In 2014 specifically, 90% of prescriptions filled by this pharmacy were made by prescribers who were later indicted or convicted. Amerisource appears to have only stopped shipping in 2017—Amerisource itself only identified [REDACTED] SORs for this pharmacy between 2013 and 2017.



- **Amerisource Exemplar Pharmacy 3**, located in Bronx County, exceeded the 95th percentile for the percentage of oxycodone volume shipped for five years straight (2012 to 2016). On average, 58% of its opioid prescriptions were paid in cash (99th percentile in the State). For three consecutive years (2013 to 2015), approximately half of all opioid scripts were filled by prescribers who were later convicted, including Robert Terdiman and Rogelio Lucas. Amerisource reported [REDACTED] SORs in 2010 and [REDACTED]. As of 2018, this pharmacy was still a customer of Amerisource.



131.    Even when pharmacies "were restricted, blocked, or terminated, [AmerisourceBergen's] system failed to ensure their accounts were de-activated." This system deficiency enabled pharmacies on the Company's "Do Not Ship" list to continue ordering and receiving opioids. After the control deficiency was discovered, the Company reinstated those customers without conducting any additional due diligence review.

132.    Despite knowing of the broad failures with its compliance program—including numerous instances in which those failures led to improper opioid distribution in New York and other states—the Company "never reported any of that information to the State as it was required to by the [New York Controlled Substances Act]." AmerisourceBergen thus negligently or recklessly failed to control its supply lines to prevent diversion. A reasonably prudent distributor of controlled substances would have anticipated the danger of opioid oversupply and diversion and protected against it by, for example: (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts much greater than appropriate, given the size of the local

populations; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers; (e) informing pharmacies and retailers about opioid diversion; and (f) in general following applicable statutes, regulations, professional standards, and guidance from government agencies.

133.     The violations described above are some the myriad examples of the Company's complete failure to monitor and report suspicious orders. This willful failure spread the terrible effects of the opioid epidemic beyond New York to other states, cities, counties, municipalities, tribal authorities, and individuals.

## THE INDIVIDUAL DEFENDANTS OBTAINED INFORMATION THAT INFORMED THEM OF THE COMPANY'S NON-COMPLIANCE WITH CONTROLLED SUBSTANCES LAWS

134.     From 2007 through 2019, the Individual Defendants obtained information that AmerisourceBergen was continuously failing in its opioid diversion and reporting obligations under the controlled substance laws. They were first advised of these serious issues by the 2007 Settlement with the DEA, which concerned the Company's violations of controlled substances laws and a 2007 acquisition of a distribution company, Bellco, known to have violated DEA regulations.

135.     Despite their knowledge, the Individual Defendants failed to satisfy their mission-critical duties to maintain adequate oversight and effective controls over the Company's controlled substances distribution. Even in the face of information about piling lawsuits, government investigations, potential flaws in the compliance programs, and even stockholder requests for improvement, they consciously failed to take action, consistently harming the Company.

**The Individual Defendants Knew of and Recklessly Disregarded the Company's Unlawful Opioid Distribution**

136.    The Individual Defendants knew of the Company's violations of the controlled substances laws since the 2007 Settlement with the DEA. Current Director Defendants Henney, Long, and McGee were members of the Board at the time of the 2007 Settlement and defendant Collis was the Company's Executive Vice President and President of its subsidiary, AmerisourceBergen Specialty Group.

137.    On November 28, 2007, the Company filed its Annual Report on Form 10-K with the SEC for the period ended September 30, 2007 (the "**2007 Form 10K**"). The 2007 Form 10-K disclosed the Company's settlement agreement with the DEA and the reinstatement of the Orlando distribution center's license. Defendants Henney, Long, McGee, Cotros, Gozon, and Hagenlocker each signed the 2007 Form 10-K.

138.    AmerisourceBergen's subsequent Annual Reports on Forms 10-K for 2008 through 2011 each included a disclosure referencing the 2007 Settlement, stating that the Company "expect[ed] to continue to comply with all of the DEA's requirements," suggesting that AmerisourceBergen was in compliance with its obligations under the 2007 Settlement. The 2008, 2009, 2010 and 2011 Forms 10-K were signed by defendants Gochnauer, Henney, Long, McGee, Cotros, Gozon, and Hagenlocker. The 2010 and 2011 were also signed by defendant Hyle.

139.    As described herein, the Company implemented a new compliance program under the 2007 Settlement, wherein the Company "agree[d] to maintain a compliance program designed to detect and prevent diversion of controlled substances, which shall apply to the Orlando Facility and all other existing and future distribution centers of AmerisourceBergen in the United States and its territories and possessions, which AmerisourceBergen shall revise as appropriate."

140. The Company's public filings explain that the Board plays a significant role in monitoring and enforcing compliance. As stated in AmerisourceBergen's 2011 Proxy, the "Chief Compliance Officer and/or Senior Vice President, General Counsel and Secretary report to the Audit Committee throughout the year on the status of our compliance program." As the 2019 Proxy stated, "Our Board oversees risk management and considers specific risk topics on an ongoing basis, including risks associated with the Company's distribution of opioid medications…. Our Board of Directors actively oversees and reviews the effectiveness of our compliance programs, including our diversion control program." Moreover, the Compliance and Risk Committee Charter requires that committee to review "at least quarterly reports received from the Company's Chief Compliance Officer, counsel and other members of management regarding the Company's compliance with applicable legal requirements, including requirements of the [DEA]."

**The Bellco Acquisition Underscores the Company's Compliance Obligations**

141. The Board was further apprised of the critical nature of compliance with the CSA's anti-diversion provisions as a result of the AmerisourceBergen's acquisition of Bellco. The Company acquired Bellco, a privately-held pharmaceutical distributor with annual revenues of approximately $2 billion, in October 2007. While the Company was negotiating the acquisition, the DEA filed a federal lawsuit against Bellco for violating the CSA by failing to maintain anti-diversion controls on controlled substances. Though it had filled over 2,300 highly suspicious orders in the New York Metropolitan area, Bellco did not report a single suspicious order to the DEA. As a result, Bellco agreed to an $800,000 fine and a consent judgment suspending its license to distribute controlled substances. *United States v. Bellco Drug Corp.*, No. 2:07-cv-02606 (E.D.N.Y. June 27, 2007). With the announcement of Bellco's failure to maintain reasonably

effective anti-diversion controls and the legal consequences thereof, the Company renegotiated the acquisition at an approximately 20% discount.

142.    The 2007 Form 10-K disclosed the Bellco acquisition, as well as Bellco's prior suspension, order to show cause, and consent judgment with the DEA. AmerisourceBergen's subsequent Annual Reports on Forms 10-K for 2008 through 2011 each included similar disclosures.

143.    Thus, no later than 2007, the Board was aware of the critical nature of compliance with the controlled substances laws. Specifically, the Board was fully apprised of the Company's requirements under the 2007 Settlement, the impact that a lack of adequate anti-diversion controls had on Bellco's valuation, and the Company's obligations under the CSA and equivalent state laws for stringent monitoring, controls, and oversight of opioid distribution to prevent future violations.

**The Government Investigates the Company's Distribution Practices**

144.    The Company continued to violate the controlled substances laws. Beginning in 2012, the DEA and several U.S. Attorney's Offices again began investigating the Company's distribution operations, including its diversion control and order monitoring program. In light of the information provided in the Company's Forms 10-Q and 10-K from 2012 through 2019, as described herein, the Board was fully aware of the ongoing lawsuits and government subpoenas during that time.

145.    On May 4, 2012, AmerisourceBergen received subpoenas from the U.S. Attorney's Office ("**USAO**") for the District of New Jersey and the DEA in connection with a grand jury proceeding. The USAO subpoena requested documents concerning the Company's program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific, and industrial purposes. The USAO also sought information

regarding specific customers' purchases of controlled substances. The DEA subpoena requested documents in connection with possible CSA violations.

146.    The Company disclosed the subpoenas in its:

- Annual Report on Form 10-K for 2012 (signed by defendants Collis, Cotros, Gochnauer, Gozon, Hagenlocker, Henney, Hyle, Long, and McGee),

- Annual Report on Form 10-K for 2013 (signed by defendants Collis, Conant, Gochnauer, Gozon Greenberg, Hagenlocker, Henney, Hyle, Long, and McGee),

- Annual Report on Form 10-K for 2014 (signed by defendants Collis, Conant, Gozon, Gochnauer, Greenberg, Hagenlocker, Henney, Hyle, Long, and McGee),

- Annual Report on Form 10-K for 2015 (signed by defendants Barra, Collis, Conant, Durcan, Gochnauer, Gozon, Greenberg, Henney, Hyle, Long, and McGee),

- Annual Report on Form 10-K for 2016 (signed by defendants Barra, Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee),

- Annual Report on Form 10-K for 2017(signed by defendants Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee),

- Annual Report on Form 10-K for 2018 (signed by defendants Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee), and

- Annual Report on Form 10-K for 2019 (signed by defendants Collis, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee).

**The State of West Virginia Sues the Company over Suspicious Order Monitoring and Distribution**

147.    On June 26, 2012, the Attorney General of the State of West Virginia filed a complaint against the Company alleging that it knowingly violated the law by failing to investigate, report, and cease fulfilling suspicious prescriptions in the state. Specifically, the Company shipped increasing amounts of opioids without sufficient monitoring or controls, facilitating six-fold increases in opioid consumption in some West Virginia counties. AmerisourceBergen was part of a drug supply chain that included doctors who wrote prescriptions for non-medical purposes and "pill mill" pharmacies that dispensed excessive numbers of painkillers.

148.     As later revealed in a December 2018 report by the U.S. House Committee on Energy and Commerce (the "**House Committee**") titled *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia* (the "**West Virginia Report**"), the Company "failed to address suspicious order monitoring" in West Virginia. The House Committee's West Virginia Report concluded that, although the Company had initially identified and halted suspicious orders from West Virginia immediately following the 2007 Settlement, its suspicious order reports declined significantly since 2013, eventually reaching nominal levels once again.

149.     Specifically, AmerisourceBergen had shipped nearly 250 million doses of the opioids hydrocodone and oxycodone to West Virginia pharmacies between 2005 and 2016. This was enough to supply every West Virginian with thirteen pain pills a year. Yet, during this time, the Company reported a high of only 792 suspicious orders in 2013 and a low of just three suspicious orders in 2016. Alarmingly, on a per-capita basis in 2017, "West Virginia had the ***second highest*** number of suspicious orders reported to the DEA by AmerisourceBergen of ***all*** states": five.

| Suspicious Order Reports Submitted by AmerisourceBergen to the DEA[988] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 2007* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 0 | 6 | 18 | 60 | 47 | 178 | 311 | 792 | 545 | 53 | 3 | 5 |
| Number (in Millions) of Oxycodone and Hydrocodone Doses Shipped to West Virginia[989] | | | | | | | | | | | |
| 18.02 | 20.34 | 22.34 | 24.03 | 16.8 | 19.94 | 21.8 | 20.16 | 19.89 | 15.85 | 11.51 | --- |

\* AmerisourceBergen began to report and block suspicious orders in July 2007, thus, the number of suspicious orders reported in 2007 represents a partial year.

150.     The House Committee report also revealed changes in *how* AmerisourceBergen responded to pharmacies that placed suspicious orders in West Virginia. A case study showed that

the Company ignored red flags regarding prescribing physicians in the state. For example, AmerisourceBergen's due diligence documents for a pharmacy called "Westside Pharmacy" included a list of six "Pain Doctors." "Two of the doctors were located a four-hour and eleven-and-a-half-hour round-trip drive from the pharmacy respectively. Five of the six doctors have either been subsequently convicted of, or indicted on, criminal charges related to their controlled substance prescribing, or are currently under federal investigation." As the report stated, AmerisourceBergen failed to investigate why Westside Pharmacy filled prescriptions for physicians located hours away from the pharmacy.

151.    AmerisourceBergen told the House Committee that it placed stricter limits on Westside Pharmacy's purchasing of controlled substances in late 2012. The House Committee, however, received no documents referencing these limitations. Further, despite the Company's statement that Westside Pharmacy voluntarily terminated its relationship with AmerisourceBergen in 2012, the House Committee received no documents with information to that effect.

152.    AmerisourceBergen began doing business with Westside Pharmacy again in 2016, but the documents produced to the House Committee gave no indication that AmerisourceBergen considered its own 2012 decision to place stricter limits on the pharmacy's ability to purchase controlled substances. Moreover, prior to the customer onboarding of Westside Pharmacy in 2016, AmerisourceBergen failed to "[consult] public news reports that would have alerted the company to red flags related to some of the pharmacy's top prescribing physicians." As the Company admitted, "[n]ews searches for prescribing physicians are not a standard part of [AmerisourceBergen's] new customer review[.]"

153.    Defendants Collis, Gochnauer, Henney, Hyle, Long, and McGee were on the Board at the time West Virginia's lawsuit was filed. AmerisourceBergen disclosed the West Virginia

action in its Annual Report on Form 10-K for 2012. Thus, these defendants were aware at least by this time in early 2012 that the Company had failed to put in place an adequate anti-diversion program in the years since the 2007 Settlement with the DEA. AmerisourceBergen continued to disclose the West Virginia action in each of its Annual Reports on Forms 10-K through 2019.

**The Company Enters into a Distribution Agreement in 2013 with Alliance Boots and Walgreens, a Known CSA Offender**

154.     On March 18, 2013, the Company announced that it had entered into a distribution agreement with Walgreens Co. ("**Walgreens**") and Alliance Boots GmbH. Defendant Barra is Co-Chief Operating Officer of Walgreens Boots Alliance, Inc., and has been a high-ranking executive at Alliance Boots GmbH or its subsidiaries and affiliates since at least 2006.

155.     Walgreens was a known CSA offender at the time of the distribution agreement with the Company. According to a DEA database of opioid shipments, Walgreens dominated the U.S. opioid market from 2006 through 2012, buying approximately 13 billion pills – 3 billion more than CVS, its closest competitor. In those years, Walgreens ordered 31% more oxycodone and hydrocodone pills per store on average than CVS pharmacies, and 73% more than other pharmacies nationwide. When Walgreens considered surveying its Florida pharmacies in 2011 to identify questionable transactions, a company attorney advised deliberate ignorance: "If these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," according to an e-mail cited by The Washington Post.[28] Then in 2012, a drug distributor produced a report for Walgreens that flagged nearly half of its pharmacies for

---

[28] Walgreens' problems with opioid diversion has persisted through today as the pharmacy "continued to send pills to stores 'without limit or review.'" Jenn Abelson et al., *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids*, Washington Post, Nov. 7, 2019), https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-hand led-nearly-one-five-most-addictive-opioids/?arc404=true.

dispensing high numbers of controlled substances, including oxycodone. After warnings from the DEA, Walgreens agreed to pay an $80 million fine, the largest in DEA history at the time, to resolve allegations that Walgreens committed an unprecedented number of violations under the CSA.

156.    Among other things, Walgreens was alleged to have pushed to increase the number of oxycodone sales to its Florida pharmacies, in part by providing bonuses to pharmacy employees based on the number of oxycodone prescriptions filled. As part of the settlement, Walgreens admitted that it had failed to uphold its obligations as a DEA registrant. Walgreens also agreed to enhance its training and compliance programs.

157.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

**The Government Investigations Escalate**

158.    On August 30, 2013, the Company received a second subpoena from the New Jersey USAO requesting additional documents regarding specific customers' purchases of controlled substances. The New Jersey USAO issued a third subpoena on December 31, 2013 seeking the Company's electronically stored information. AmerisourceBergen disclosed the additional subpoenas in its Annual Reports on Forms 10-K for 2013 through 2019.

159.    Also in 2013, the Company received similar subpoenas from two more USAOs- in the District of Kansas and the Northern District of Ohio. Both subpoenas sought documents regarding the Company's diversion control program and specific customers' purchases of

---

[29] ████████████████████████████████████████████

controlled substances. AmerisourceBergen disclosed the additional subpoenas in its Annual Reports on Forms 10-K for 2013 through 2019.

160.    The lawsuit and government investigations still continue through this day. In 2014, the Company received two more subpoenas from the New Jersey USAO, as well as additional subpoenas from the District of Kansas and Northern District of Ohio USAOs related to AmerisourceBergen's anti-diversion and monitoring programs for controlled substances. ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Together with the subpoenas, this spike in reports should have been a red flag that the Company's diversion and control programs were inadequate.

161.    In July 2017, the New Jersey USAO and the DEA served still more subpoenas requesting documents relating to the Company's diversion control programs "from 2013 to the present." In September 2017, the Company received a request for documents and information on behalf of forty-one Attorneys General investigating AmerisourceBergen's distribution of prescription opioid pain medication. The Company has since received similar subpoenas from the USAO's for the Eastern District of New York, the District of Colorado, the Northern District of West Virginia, the Western District of Michigan, the Middle District of Florida, the Southern District of Florida, and the Eastern District of California. AmerisourceBergen disclosed the additional subpoenas in its Annual Reports on Forms 10-K for 2014 through 2019.

162.    The subpoenas and ongoing litigation should have placed the Company's opioid distribution practices front and center and alerted the Individual Defendants to grave concerns about

---

<sup>30</sup> ████████████████████████████████████████████
████████████████████████████

the sufficiency of the Company's anti-diversion and monitoring programs.

**The Company Settles with West Virginia**

163. On January 9, 2017, AmerisourceBergen settled the West Virginia action by paying the State of West Virginia $16 million and agreeing to adhere to stricter reporting guidelines within West Virginia. The settlement money would go to drug treatment programs that help West Virginians addicted to opioid drugs. AmerisourceBergen disclosed the settlement in its Annual Reports on Forms 10-K for 2017 through 2019.

**The Company Lobbies Congress to Loosen Opioid Regulations**

164. The Company's response to this increased scrutiny was to lobby Congress to pass legislation that would strip the DEA of its ability to effectively regulate the Company and other Opioid Distributors. The Company, individually and collectively through trade and industry groups, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to remove the DEA's power to immediately suspend distributor registrations.

165. Between 2014 and 2016, AmerisourceBergen spent $3.8 million and the HDA spent another $3.5 million lobbying Congress to pass the "Ensuring Patient Access and Effective Drug Enforcement Act," ("**EPAEDEA**"), which it did in 2016.[31] The Act permits Registrants like AmerisourceBergen to submit a "corrective action plan" that the DEA must consider in situations where it serves an order to show cause why a Registrant's registration should not be denied, revoked, or suspended. *See* 21 U.S.C. §824(c).

166. The DEA's chief administrative law judge, John J. Mulrooney II, wrote that this provision "is akin to a state legislature mandating that law enforcement authorities allow shoplifting

---

[31] Scott Higham & Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Washington Post, Oct. 15, 2017, https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industrycongress/.

suspects caught in the act to outline how they intend to replace purloined items on store shelves; allow intoxicated drivers to pull to the side of the road and park their previously swerving vehicles; or perhaps allow bank robbers to round up and return ink-stained money and agree not to rob any more banks – all before any of those wrongdoers actually admit fault and without any consequence that might deter such behavior in the future."

167.    The EPAEDEA also reduced the Attorney General's discretion to "suspend any registration simultaneously" with the initiation of revocation hearings where there is an "imminent danger to the public health or safety." The phrase "imminent danger to the public health or safety" is statutorily defined to mean there is "a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration." 21 U.S.C. §824(d).

168.    According to Judge Mulrooney, "it is all but logically impossible, due to the obvious attenuation between the distributor or manufacturer registrant and the potential victims, to make the requisite showing up the production chain, in the case of a distributor or manufacturer…. If it had been the intent of Congress to completely eliminate the DEA's ability to ever impose an immediate suspension on distributors or manufacturers, it would be difficult to conceive of a more effective vehicle for achieving that goal."

**The Opioid MDL**

169.    As of 2018, thousands of plaintiffs filed lawsuits against the Company and other Opioid Distributors and manufacturers in connection with the opioid crisis. These actions generally allege damages caused at least in part by AmerisourceBergen's violations of controlled substance laws in distributing billions of doses of opioids while failing to maintain an effective anti-diversion and reporting program. The plaintiffs seek compensation for the truly massive sums they have spent

in grappling with health care and crime issues since the defendant companies began their scheme. AmerisourceBergen and the other distributor defendants have proposed $10 billion to settle the claims by states, and the state regulators countered with $45 billion.[32] The federal lawsuits have been consolidated for MDL in the U.S. District Court for the Northern District of Ohio. The Company disclosed the opioid MDL and costs of the litigation in its Annual Reports on Forms 10-K for 2018 and 2019. To date, the Company has spent more than **$1 billion** on costs related to opioid litigation.

170.    The Company received additional subpoenas in 2018 from the USAOs for the Eastern District of New York, the District of Colorado, the Northern District of West Virginia, the Western District of Michigan, and the Middle District of Florida. Those subpoenas were "substantively similar to the subpoena received from the USAO-NJ in 2017." AmerisourceBergen disclosed the above subpoenas in its Annual Reports on Forms 10-K for 2018 through 2019.

171.    On December 19, 2018, the Northern District of Ohio largely denied the defendants' motions to dismiss the operative complaint in the MDL. Discussing the adequacy of plaintiffs' Racketeer Influenced and Corrupt Organizations Act claims, the court credited their allegations that the Company and the other defendants' "intentionally turned a blind eye to orders of opiates they knew were suspicious, thereby flooding the legitimate medical market and creating a secondary 'black' market at great profit to [d]efendants and at great cost to [p]laintiffs." Similarly, in discussing plaintiffs' negligence claims, the court found that, "taking [p]laintiffs' allegations as true, by failing to administer responsible distribution practices (many required by law), [d]efendants

---

[32] Jef Feeley, *Opioid Distributors Propose $10 Billion to End State Claims*, Bloomberg (Aug. 6, 2019), https://www.bloomberg.com/news/articles/2019-08-06/opioid-distributors-propose-10billion-to-end-state-lawsuits.

not only failed to prevent diversion, but affirmatively created an illegal, secondary opioid market" that defendants were "responsible for combatting." The cases continue to advance.

172. On October 21, 2019, AmerisourceBergen, along with distributors Cardinal Health and McKesson and manufacturer Teva Pharmaceutical Industries, agreed to pay a combined $260 million settlement with two Ohio counties to avoid the first scheduled federal opioid trial. The Ohio counties' lawsuits were expected to serve as the bellwether trials for the broader MDL. The settlement, if extrapolated to a nationwide deal resolving all litigation for the four defendants, suggests a settlement value of around $48 billion, based on a court-approved allocation formula. Analysts have estimated that a global settlement for all related opioid litigation could cost as much as $100 billion.

**Defendant Collis' Testimony to Congress**

173. On May 8, 2018, defendant Collis testified about AmerisourceBergen's role in the opioid crisis before the House Energy and Commerce Committee. The Congressional Committee sought to further explore opioid distribution practices in West Virginia, as "the opioid epidemic continues to harm public health."

174. Defendant Collis' sunny testimony was in stark contrast to the Company's systematic failure to implement an adequate anti-diversion program in West Virginia as described in above.

175. Collis testified in his opening statement that:

> For more than a decade, we've reported every opioid order we distribute on a daily basis to the DEA. So every order, every shipment, every day. We use statistical-based algorithms and data analytics tools to monitor and asses every order we receive in an effort to identify, stop, and report suspicious orders. Just as importantly, we continuously focus on enhancing our diversion control efforts. And ***our best-in-class diversion-control team*** endeavors to track patterns and behaviors beyond just individual suspicious orders that have led us to refuse service or terminate service to pharmacies

> we're identified as problematic, including several of the pharmacies we
> have all heard about today in West Virginia.

(emphasis added).

176.    When questioned by Chairman Gregg Harper (R-Miss.) about the Opioid

Distributors' role in the opioid crisis, Collis asserted that AmerisourceBergen did not contribute to

the opioid epidemic but rather "always discharged [their] duties effectively and responsibly and

have maintained an adequate diversion program."

177.    When questioned by Rep. Tim Walberg (R-Mich.), Collis testified as follows:

> Q:      AmerisourceBergen reported 199 of its suspicious orders for
> Beckley Pharmacy [in West Virginia] between 2013 and March of 2014.
> But documents your company provided to the committee indicate that
> Amerisource didn't investigate the pharmacy until February 2015. Please, if
> you would, turn to tab 46 to see the investigator's February 2015 report,
> which found, and I'll read that:
>
>> The pharmacist said that 50 percent of prescriptions he filled were
>> for controlled substances and that customers told him other
>> pharmacies wouldn't fill their prescriptions. Some of the pharmacies
>> top 10 prescribers were among the top hydrocodone prescribers in
>> the State, and the pharmacy security guard referred to customers as
>> drug addicts and drug dealers and said he witnessed numerous drug
>> deals in the parking lot after customers filled oxycodone
>> prescriptions.
>
> Amerisource didn't stop doing business with that pharmacy until November
> 2015, 10 months after the investigator's report, which itself came only after
> your company filled hundreds of suspicious orders. The company is
> supposed to use, and I quote, "complex algorithms" to identify problems
> pharmacies have. So why did it take so long?
>
> A:      I have a team, some of them are behind me. We trust them. I think
> that we--I have never heard of this pharmacy before. But we're committed
> to continuous learning. And if we made mistakes, hopefully we'll rectify
> them and they won't happen in the future.

178.    The Individual Defendants' actions are not "mistakes." As set forth above, the

Individual Defendants have breached their fiduciary duty by systematically failing to exercise

proper oversight of the Company's compliance with controlled substances laws, despite numerous

investigations, lawsuits, Congressional inquiries, and calls to action by AmerisourceBergen's own stockholders.

179.    The Individual Defendants have continued to allow AmerisourceBergen to violate its 2007 Settlement agreement with the DEA. Despite knowing of the need for continued monitoring and improvement of AmerisourceBergen's anti-diversion and reporting processes for opioids, the Individual Defendants failed to ensure that such programs were effective. As detailed herein, AmerisourceBergen distributed a multitude of suspicious orders of opioids far in excess of the needs of any specific geographic area, all while failing to report suspicious orders as required by law. As a result of this recidivist wrongdoing, AmerisourceBergen has been the subject of numerous regulatory investigations and lawsuits, damaging the Company and exposing it to further astronomical liability.

## THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN THE COMPANY'S 2018 PROXY

180.    Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

181.    On January 19, 2018, the Company issued its 2018 Proxy filed on Form DEF 14A with the SEC for the 2018 Annual Meeting of Stockholders, which was held on March 1, 2018. In the 2018 Proxy, defendants Barra, Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long and McGee solicited stockholder votes to, among other things: (i) reelect defendants Barra, Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long and McGee to the Board; and (ii) reject two stockholder proposals for improved internal controls to combat AmerisourceBergen's

contribution to the opioid epidemic. Defendants Barra, Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long and McGee negligently issued misleading statements with respect to each of these solicited votes.

**Misstatements in Support of Reelecting Defendants Barra, Collis, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee, and Electing Defendant Conant to the Board**

182.    In support of defendants Barra, Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee's bid to reelect themselves to the Board, these defendants highlighted their risk oversight duties and responsibilities. These responsibilities included oversight over "legal, regulatory and operational risks" to the Company, including oversight over its purportedly "sophisticated diversion control program through which the Company provides daily reports directly to the [DEA] about the quantity, type, and receiving pharmacy of every order of controlled substances we distribute."

183.    In particular, the 2018 Proxy stated:

**How does the Board oversee our risk management process?**

The Board executes its oversight responsibility for risk management directly and through its committees, as follows:

•      The Board considers specific risk topics throughout the year, including risks associated with our business plan, operational efficiency, strategic objectives, government regulation, investment opportunities, physical facilities, information technology (including cybersecurity) and capital structure, among many others. Each fiscal quarter, our Chief Financial Officer reports to the Board on AmerisourceBergen's financial performance and explains how actual performance compares to our business plan. Our corporate officers and the leaders of our principal business units report regularly to the Board about the risks and exposures related to their areas of responsibility. The Board is informed about and regularly discusses our risk profile, including legal, regulatory and operational risks to our business. The Board also oversees our compliance policies and practices, including our sophisticated diversion control program through which the Company provides daily reports directly to the Drug Enforcement Administration about the quantity, type, and receiving pharmacy of every order of controlled substances we distribute.

•       Each Board committee reports to the Board at every regular Board meeting on the topics discussed and actions taken at the most recent committee meeting. The Board discusses the risks and exposures, if any, involved in the matters or recommendations of the committees, as necessary.

•       Our Audit Committee has primary responsibility for monitoring our internal audit, corporate, financial and regulatory risk assessment and risk management processes and overseeing our system of internal controls and financial reporting. The Audit Committee discusses specific risk areas throughout the year, including those that may arise in various business units and the measures taken by management to monitor and limit risk. In addition, the Audit Committee oversees the development and implementation of our enterprise risk management program.

* * *

•       The Board's other committees oversee risks associated with their respective areas of responsibility. For example, the Governance and Nominating Committee oversees our corporate governance practices generally, giving particular consideration to our role as a distributor in the pharmaceutical supply chain. Additionally, the Compensation and Succession Planning Committee assesses risks associated with our compensation policies and programs for executives as well as employees generally. Our Finance Committee discusses risks relating to our capital structure, financing activities, dividend and tax policy and share repurchase activities.

•       We have a Chief Compliance Officer who oversees our corporate compliance program, including training on and monitoring compliance with our Code of Ethics and Business Conduct and the Company's reporting, investigation and corrective action program. We also have an internal Compliance Committee composed of senior executives, including our Chief Compliance Officer and Chief Compliance Counsel, which supports the Chief Compliance Officer in fulfilling his responsibilities and driving corporate adherence to our compliance program, Code of Ethics and Business Conduct and related policies and procedures. Our Chief Compliance Officer and Chief Compliance Counsel provide reports to the Audit Committee and the full Board throughout the year on corporate compliance matters, the status of our compliance programs (including our diversion control program described above), calls to our hotline and any other material developments.

184.    Referencing the Company's Corporate Governance Principles and the Code, the 2018 Proxy further stated:

> Our Board has adopted our corporate governance principles. Together with the charters of the Board committees, they provide the framework for the governance of AmerisourceBergen. Our corporate governance principles clearly delineate the authority and roles of the Chairman of the Board and the Lead Independent Director in the leadership of the Board, mandate the independence of the committee Chairs and all the members of our audit, compensation and governance committees, and affirm non-employee directors' access to managers and associates outside the presence of our executives.
>
> * * *
>
> ### Code of Ethics
>
> * * *
>
> The Board of Directors adopted our Code of Ethics and Business Conduct in May 2004. We review and revise the Code of Ethics and Business Conduct from time to time, most recently in March 2017. It applies to directors and employees, including officers, and is intended to comply with the requirements of Section 303A.10 of the NYSE Listed Company Manual.
>
> * * *
>
> We have adopted our Code of Ethics for Designated Senior Officers in accordance with Item 406 of the SEC's Regulation S-K. It applies to our President and Chief Executive Officer, Executive Vice President and Chief Financial Officer and Senior Vice President and Corporate Controller.

185.    The 2018 Proxy thus assured stockholders that the Board abided by AmerisourceBergen's Corporate Governance Principles and Code, and actively monitored the Company's risks and internal controls.

186.    In truth, the 2018 Proxy was materially false and misleading because the Board utterly failed in its oversight duties by allowing the Company to flood the market with illicit opioids and operate with inadequate internal controls. As detailed herein, the Board failed to execute its

oversight responsibility for risk management over the Company. Thus, the 2018 proxy was misleading.

187.    The 2018 Proxy harmed AmerisourceBergen by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As a result of the misleading statements therein, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Barra, Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee to the Board.

**Misstatements in Opposition to Adopting Policies to Require the Company to Operate with Improved Internal Controls**

188.    The 2018 Proxy contained a stockholder proposal, Proposal 5, submitted to the Company for action at the 2018 Annual Meeting. Under Proposal 5, stockholders urged the Board to adopt a policy wherein the Chairman of the Board shall be an independent director who has not previously served as an executive officer of the Company. In particular, the 2018 Proxy Proposal 5 stated:

> Shareholders of AmerisourceBergen Corp., ("the Company" or "AmerisourceBergen"), urge the Board of Directors ("the Board") to take the steps necessary to adopt a policy, with amendments to governing documents as needed, so that, to the extent feasible, the Chairman of the Board shall be an independent director who has not previously served as an executive officer of the Company. The policy should be implemented so as not to violate any contractual obligations and should specify the process for selecting a new independent chairman if the chairman ceases to be independent between annual meetings of shareholders or if no independent director is available and willing to serve as chairman.

189.    In support of Proposal 5, the stockholders cited to the Board's duty to "provide rigorous oversight of management to protect the interests of the Company and shareholders. This oversight may be weakened if the chairman is also the chief executive officer-as at AmerisourceBergen-or is otherwise not independent from management." According to Proposal 5,

such considerations are "especially critical at AmerisourceBergen given the potential reputational,

legal and regulatory risks AmerisourceBergen faces over its role in the nation's opioid epidemic."

In particular, Proposal 5 stated:

> The Board's role, led by its chairman, is to provide rigorous oversight of management to protect the interests of the Company and shareholders. This oversight may be weakened if the chairman is also the chief executive officer-as at AmerisourceBergen-or is otherwise not independent from management. Even with robust responsibilities, the lead independent director's position is inadequate to this task because ultimate responsibility for board leadership remains with the chairman/CEO. An independent chairman can best facilitate effective deliberation of strategy, risk oversight and management accountability.

> These considerations are especially critical at AmerisourceBergen given the potential reputational, legal and regulatory risks AmerisourceBergen faces over its role in the nation's opioid epidemic. According to the Centers for Disease Control, prescription opioids claim 62 lives a day in this country.

> According to a Pulitzer prize-winning review of the Drug Enforcement Administration drug shipping sales by The Charleston Gazette-Mail, AmerisourceBergen supplied over 132 million hydrocodone and oxycodone pills between 2007 and 2012 to West Virginian pharmacies, enough to supply approximately 72 pills for every adult and child in the state.

> In January 2017, AmerisourceBergen agreed to pay $16 million to settle a lawsuit from the State of West Virginia alleging AmerisourceBergen violated the law in failing to investigate, report, and cease fulfilling suspicious prescriptions in the state. As of July 2017, lawsuits had been filed by a number of West Virginia counties and municipalities alleging similar actions.

> In May 2017, The U.S. House Energy and Commerce Committee began examining alleged pill dumping in West Virginia and the potential role played by AmerisourceBergen and other large drug distributors.

> In April 2017, The Washington Post reported AmerisourceBergen was one of the pharmaceutical industry companies being sued by the Cherokee Nation in tribal court for failing to prevent the diversion of pain pills. The lawsuit states in 2015, enough prescription opioids were distributed in the Cherokee Nation for 955-5 mg. dose pills per adult and child.

> In the midst of such scrutiny, an independent chairman is invaluable in providing robust oversight of management and ensuring good communications and credibility with stakeholders.

190.    The Board recommended that stockholders vote ***against*** Proposal 5. According to the Board's statements in the 2018 Proxy, "[the Company's] stockholders benefit most when the Board has the ability to determine the leadership structure that best serves the stockholders' interests." The Board further asserted that it "believes that there is already substantial oversight of management," and that the "Board is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse."

191.    In particular, supplying the Board's reasoning for stockholders to vote against Proposal 5, the 2018 Proxy stated:

> **The Board is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse.**
>
> As a pharmaceutical distributor, we facilitate a safe and secure supply chain for the distribution of a broad range of pharmaceutical medications, including opioids. As part of our compliance program, we have a sophisticated diversion control program through which we provide daily reports directly to the Drug Enforcement Administration about the quantity, type and receiving pharmacy of every order of controlled substances we distribute. Through this program, we seek to minimize diversion in the supply chain by cancelling orders that are identified as suspicious and reporting them to the Drug Enforcement Administration, while ensuring access to these prescription medications to patients with legitimate needs.
>
> Our Chairman and CEO, Lead Independent Director and entire Board actively oversee and review the effectiveness of our compliance programs, including our diversion control program, and receive regular updates from the Company's management on our compliance program's guidelines, training initiatives, monitoring activities and any enforcement or corrective responses. The Board also supports management's efforts more broadly to develop meaningful solutions to the opioid epidemic, which the Board understands will require close collaboration with doctors, pharmacies, manufacturers, policy makers and other stakeholders in the healthcare industry.

192.    The statements in the 2018 Proxy in opposition to Proposal 5 thus assured stockholders that the Board was "actively engaged" in overseeing the Company's opioid distribution and reporting controls. The Board repeated its claim that the Company has a "sophisticated diversion control program through which we provide daily reports" to the DEA. In addition, the Board stated it "receive[s] regular updates … on our compliance program's guidelines, training initiatives, monitoring activities and any enforcement or corrective responses." Moreover, the Board stated it "supports management's efforts more broadly to develop meaningful solutions to the opioid epidemic." The 2018 proxy was therefore materially false and misleading because the Board utterly failed in its oversight duties by allowing the Company to flood the market with illicit opioids and operate with inadequate internal controls.

193.    The 2018 Proxy included another stockholder proposal, Proposal 8, submitted to the Company for action at the 2018 Annual Meeting. Under the proposal, stockholders urged the Board to report to stockholders by September 30, 2018 on the governance measures the Company has implemented since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis. In particular, Proposal 8 stated:

> RESOLVED,      that    shareholders    of    AmerisourceBergen
> Corporation ("AmerisourceBergen") urge the Board of Directors (the
> "Board") to report to shareholders by September 30, 2018 on the
> governance measures AmerisourceBergen has implemented since 2012 to
> more effectively monitor and manage financial and reputational risks
> related to the opioid crisis in the U.S., given AmerisourceBergen's
> distribution of opioid medications, including whether AmerisourceBergen
> has assigned responsibility for such monitoring to the Board or one or more
> Board committees, revised senior executive compensation metrics or
> policies, adopted or changed mechanisms for obtaining input from
> stakeholders, or altered policies or processes regarding company political
> activities.
>
> The report should be prepared at reasonable cost and should omit
> confidential and proprietary information.

194.   In support of Proposal 8, the stockholders cited to the Company's recent "$16 million settlement with the Attorney General of the state of West Virginia over claims the company acted negligently by distributing controlled substances to pharmacies that serve individuals who abuse controlled substances, and failed to report suspicious orders of uncontrolled substances in accordance with state regulations."

195.   According to Proposal 8, it was not clear from Board committee charters or proxy statements whether a specific Board committee monitors opioid-related financial and reputational risks. In particular, Proposal 8 stated:

> [I]t is not clear from AmerisourceBergen's Board committee charters or proxy statement whether a specific Board committee monitors opioid-related financial and reputational risks; for example, none of the Board committees has been assigned specific responsibility for overseeing potentially opioid-related compliance matters such as DEA reporting. As well, AmerisourceBergen's most recent proxy statement asserts that individual performance is among the factors considered in granting annual equity incentive awards to named executive officers, but does not indicate whether any opioid-related objectives, such as promoting ethical conduct, were part of that performance assessment.

196.   The Board recommended that stockholders vote ***against*** Proposal 8. According to the Board's statements in the 2018 Proxy, "AmerisourceBergen already has publicly disclosed controls to manage significant risks associated with the Company's business." Further, the Board stated that it "is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse," and, as a result, "believes that the preparation of a separate report is not necessary." In support for the Board's recommendation to vote against Proposal 8, the 2018 Proxy stated:

> **The Board is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse.**
>
> As a pharmaceutical distributor, AmerisourceBergen facilitates a safe and secure supply chain for the distribution of a broad range of pharmaceutical

medications, including opioids. As part of our compliance program, we have a sophisticated diversion control program which involves direct communications and coordination with the Drug Enforcement Administration (the "DEA"). Our entire Board, led by our Chairman and CEO and Lead Independent Director, actively oversees and reviews the effectiveness of our compliance programs. The Board also supports management's efforts more broadly to develop meaningful solutions to the opioid epidemic, which the Board understands will require close collaboration with doctors, pharmacies, manufacturers, policy makers and other stakeholders in healthcare.

AmerisourceBergen's commitment to help combat the opioid epidemic is demonstrated by our coordination across our industry with other distributors and the Healthcare Distribution Alliance and close collaboration with legislators, policy makers and regulatory agencies to continue to monitor and stop suspicious orders and minimize and deter diversion. We continue to invest millions of dollars in our best-in-class Diversion Control Team. In addition to our continued reporting and stopping of orders determined to be suspicious, we also continue to provide daily reports about the quantity, type and receiving pharmacy of every single order of controlled substances we distribute to regulatory and enforcement professionals. Additionally, along with our partner Walgreens, we have expanded the Safe Medication Disposal Kiosks take-back program and our Good Neighbor Pharmacy safe drug disposal program in conjunction with the national DEA Prescription Drug Take-Back Day. Our AmerisourceBergen Foundation is also actively working to support a broader range of grants and educational programs. AmerisourceBergen takes very seriously our role in the supply chain and our responsibility to patients getting FDA-approved drugs from pharmaceutical companies that manufacturer them to DEA-registered pharmacies that dispense them based on prescriptions written by licensed healthcare providers. We are continuously working to identify and explore innovative ideas to combat the crisis, and have formed an internal cross-functional Opioids Task Force to help coordinate these efforts across the enterprise.

197.    The 2018 Proxy's statements in opposition to Proposal 8 thus assured stockholders that the Board is "actively engaged" in overseeing the Company's opioid distribution and reporting controls. The Board repeated its false claim that "AmerisourceBergen facilitates a safe and secure supply chain for the distribution" of opioids and has a "sophisticated diversion control program."

198.    Nor did AmerisourceBergen demonstrate its "commitment to help combat the opioid epidemic" by its "coordination … with other distributors and the [HDA] and close collaboration

with legislators, policy makers and regulatory agencies to continue to monitor and stop suspicious orders and minimize and deter diversion."

199.    As described in the thousands of lawsuits brought by federal, state, and local government entities, the Company failed to "stop suspicious orders and minimize and deter diversion" on a nationwide scale. As a result, the 2018 Proxy was materially false and misleading because the Board utterly failed in its oversight duties by allowing the Company to flood the market with illicit opioids and operate with inadequate internal controls.

200.    The above statements concerning Proposals 5 and 8 misleadingly represented that the Company conducted its business in compliance with applicable laws, including all regulations governing the Company's distribution of opioids.

201.    The above statements also fail to disclose the real reason the Board recommended Proposals 5 and 8 be rejected. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

202.    The above statements also misleadingly represented that AmerisourceBergen had in place policies and practices concerning social and governance issues that made the preparation of a monitoring report to stockholders unnecessary. In truth, as detailed herein, the Company had inadequate internal controls and the Individual Defendants failed in their oversight duties to monitor the distribution of suspicious orders of opioids and report suspicious orders to the proper authorities.

---

203.    As a result of these misleading statements, the Company's stockholders voted against: (i) adopting a policy requiring the Chairman of the Board to be an independent director who has not previously served as an executive officer of the Company; and (ii) requiring the Board to report to stockholders on the governance measures implemented since 2012 to more effectively monitor risks related to the opioid crisis in the United States. The Company's stockholders voted against each of these proposals without adequate information to make a reasonably informed decision.

## DAMAGES TO AMERISOURCEBERGEN

204.    The Individual Defendants' participation in the wrongdoing detailed above and their failure to remedy the Company's improper business practices have exposed AmerisourceBergen to billions of dollars in liability for individual and class action lawsuits. AmerisourceBergen has been named as a defendant in thousands of lawsuits brought by various federal, state, and local governments related to the Company's unlawful distribution of opioids. As the Company admitted in its Annual Report on Form 10-K filed with the SEC on November 19, 2019, "an adverse judgment or negotiated resolution in any of these matters could have a material adverse effect on the Company's results of operations, consolidated financial position, cash flows or liquidity." Indeed, the Company has already spent $1 billion on opioid-related litigation.

205.    AmerisourceBergen's performance issues also damaged its reputation within the business community, with the public, and in the capital markets. In addition to price, AmerisourceBergen's current and potential customers consider a company's ability to comply with laws, rules, and regulations designed to address and decrease the opioid epidemic. Businesses are less likely to award contracts to companies that have problems complying with the law. AmerisourceBergen's ability to raise equity capital or debt on favorable terms in the future is now

impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

206.



The damage to the Company's reputation as a result of the Board's failure to implement a functional diversion control and compliance program has been immense. Further, as a direct and proximate result of the Individual Defendants' actions, AmerisourceBergen has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the opioid lawsuits and investigations brought by states, counties, municipalities, other governmental entities, and tribes in various federal, state, and other courts against the Company, including, without

---

34

limitation, the MDL consolidated before the Northern District of Ohio for violations of controlled substances laws;

      (b)    costs incurred from defending and paying any settlement in the 2017 action brought by the state of West Virginia for violations of controlled substances laws, including, without limitation, costs incurred from complying with and adhering to stricter reporting guidelines within West Virginia;

      (c)    costs incurred in complying with the governmental investigations into the misconduct detailed herein, including any fines or penalties resulting therefrom; and

      (d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to AmerisourceBergen.

## DEMAND FUTILITY

207.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

208.    Plaintiff brings this action derivatively on behalf of AmerisourceBergen to redress the injuries to the Company suffered as a result of Defendants' misconduct.

209.    Plaintiff currently owns shares of the Company's common stock and has owned shares of the Company's stock continuously since March 2003 and throughout the entire period of the Individual Defendants' misconduct.

210.    Plaintiff understands its obligation to hold shares of the Company's common stock for the duration of this action and is prepared to do so.

211.    Plaintiff will adequately and fairly represent the interests of AmerisourceBergen in enforcing and prosecuting its rights and is represented by counsel experienced in stockholder derivative litigation.

212.    The Board consists of the following ten directors: Individual Defendants (i) Barra, (ii) Collis, (iii) Durcan, (iv) Gochnauer, (v) Greenberg, (vi) Henney (vii) Hyle, (viii) Long, (ix) McGee, and (x) Dennis M. Nally.

213.    Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because at least half the Board (i.e., five directors) faces a substantial likelihood of personal liability for their misconduct. Further, there is reason to doubt that at least half the Board could have made an independent and disinterested decision to bring the claims asserted in this action. Accordingly, pre-suit demand is excused as futile.

**At Least Half the Board Faces a Substantial Likelihood of Personal Liability**

214.    Demand is futile because at least half the Board (i.e., at least five directors) faces a substantial likelihood of personal liability.

215.    As alleged above, defendants (i) Barra, (ii) Collis, (iii) Durcan, (iv) Gochnauer, (v) Greenberg, (vi) Henney, (vii) Hyle, (viii) Long, and (ix) McGee violated section 14(a) of the Exchange Act by negligently making the misstatements and omissions in the 2018 Proxy. These nine defendants are responsible for the negligently made statements in the materially misleading 2018 Proxy. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, any indemnification provided by the Company to these nine defendants does not protect them from violations of section 14(a) in the 2018 Proxy. As a result, these nine defendants face a substantial likelihood of liability, excusing demand.

216.    Furthermore, these nine defendants breached their fiduciary duties of loyalty by abdicating their responsibility to exercise proper oversight of AmerisourceBergen. The Director Defendants were, at all relevant times, well aware of the stringent government regulation over controlled substances distribution, the Company's DEA reporting requirements under the 2007

78

Settlement, the 2017 settlement with the State of West Virginia, and the opioid epidemic facing the nation especially considering that AmerisourceBergen is the second-largest distributor of prescription opioids. Yet they still failed to act.

217.





218. ████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ And indeed, for over a decade, the Company

continued to have an exceedingly high rate of suspicious opioid shipments while at the same time

reporting relatively low numbers of suspicious orders to the DEA, a glaring red flag that should

have alerted the Board that the Company's diversion and compliance programs were not working.

Accordingly, demand is excused.

219.    In addition, defendants (i) Barra, (ii) Collis, (iii) Durcan, (iv) Gochnauer, (v)

Greenberg, (vi) Henney, (vii) Hyle, (viii) Long, and (ix) McGee disregarded the responsibilities

that AmerisourceBergen's own Code imposed on them. Specifically, the Company committed to

conduct its business in compliance with all applicable laws, rules, and regulations and mandated

that all officers, directors, and employees exemplify "the highest level of business ethics, honesty

and integrity." In short, AmerisourceBergen's Code requires its officers, directors, and employees

to obey the law. Notwithstanding the Code's provisions, each of these defendants acquiesced to, if

not participated in, the decision to continue oversupplying the market with opioids and failed to

monitor and report suspicious orders to the proper authorities. These defendants knew of the duties

imposed on them but failed to act, resulting in AmerisourceBergen's massive revenues gained from

the opioid distribution scheme.

220.    Defendants (i) Durcan, (ii) Gochnauer, (iii) Greenberg, (iv) Henney, (v) Hyle, (vi) Long and (vii) McGee, as members of the Audit Committee, were specifically charged with compliance oversight responsibilities. The Audit Committee's Charter provides that it is responsible for compliance with legal and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the Company to operate with improper controls over the distribution of opioids.

221.    Defendants (i) Durcan, (ii) Gochnauer, (iii) Greenberg, (iv) Henney, (v) Hyle, (vi) Long and (vii) McGee, as members of the Audit Committee, reviewed and approved the improper statements in the 2018 Proxy. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's regulatory compliance and disclosure controls. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused the improper statements in the 2018 Proxy. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

222.    AmerisourceBergen's history of non-compliance with the CSA and knowledge of the opioid epidemic render this derivative action distinct from those against most other corporate boards. A typical corporate board might plausibly claim ignorance when it comes to compliance failures. Here, however, the 2007 Settlement specifically required the Company to create a robust compliance program. The Board's failure to carry out the terms of the 2007 Settlement with the DEA, and permitting AmerisourceBergen to repeatedly violate the CSA, cannot be regarded as the valid exercise of business judgment.

223.     The record is equally clear that despite the 2007 Settlement with the DEA, the Board failed to assure the Company's compliance with it. As discussed above, The House Committee issued the West Virginia Report in 2018. The West Virginia Report found that AmerisourceBergen and the two other largest wholesale opioid distributors in the United States "failed to address suspicious order monitoring" in West Virginia. The West Virginia Report also concluded that although AmerisourceBergen initially had identified and halted suspicious orders from West Virginia following the 2007 Settlement with the DEA, the Company's reporting of suspicious orders declined significantly in the following years and eventually reached only nominal levels.

224.     In 2013, the Company shipped 20.2 million doses of opioids to West Virginia and reported 792 suspicious orders. Two years later, in 2015, AmerisourceBergen shipped 15.85 million doses to West Virginia yet reported only 53 suspicious orders. In 2016, AmerisourceBergen's reporting of suspicious orders became virtually non-existent: it shipped 11.5 million doses to West Virginia yet reported only *three* suspicious orders. Similarly, in 2017 AmerisourceBergen reported only five suspicious orders. The West Virginia Report inferred that the downward trend for AmerisourceBergen's reporting of suspicious orders in West Virginia reflected a broader nationwide trend, because "in 2017, on a per-capita basis, West Virginia had the second highest number of suspicious orders reported to the DEA by AmerisourceBergen of all states."

225.     The West Virginia Report also documented changes in how AmerisourceBergen responded to pharmacies that placed suspicious orders. For example: in 2009, the Company terminated its relationship with a pharmacy after it submitted thirty-six suspicious orders in a single month. But between 2013 and 2014, when a pharmacy submitted 109 suspicious orders over a period of five months, AmerisourceBergen continued doing business with the pharmacy.

226.   Also in 2018, the U.S. Senate Homeland Security and Governmental Affairs Committee released a report titled *Fueling an Epidemic, Report Three: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement* (the "**Missouri Report**"). The Missouri Report similarly concluded that AmerisourceBergen and the two other largest wholesale opioid distributors had "consistently failed to meet their reporting obligations" regarding suspicious orders. Moreover, AmerisourceBergen reported suspicious orders far less frequently than its peers, even when shipping roughly the same quantities of opioids. For example, between 2012 and 2017, AmerisourceBergen and McKesson each shipped around 650 million doses to Missouri; McKesson reported 16,714 suspicious orders while AmerisourceBergen reported only 224.

227.   All of the Individual Defendants were thus responsible for a sustained or systematic failure to exercise oversight and knew that they were not exercising the requisite oversight, especially in light of the Company's poor regulatory history including the 2007 settlement, the 2017 settlement with the State of West Virginia, the West Virginia Report, the Missouri Report, and the MDL.

228.   Accordingly, a majority of the Board faces a substantial likelihood of personal liability, making demand upon the Board futile.

**There is Reason to Doubt that at Least Half the Board Could Have Made an Independent and Disinterested Decision**

229.   Demand is also futile because there is reason to doubt that at least half the Board (i.e., five directors) could have made an independent and disinterested decision to bring the claims asserted in this action.

230.   **Barra** is deemed by the Company not to be independent in its 2020 Proxy on Schedule 14A.[35] This is because she is designated to the Board by Walgreens Boots Alliance, Inc., which owns approximately 27% of the Company's issued and outstanding common stock. According to the Company's Form 10-K dated November 19, 2019, Walgreens Boots Alliance, Inc. is the Company's largest customer, accounting for approximately 34% of the Company's revenue. Accordingly, there is reason to doubt that she could have made an independent and disinterested decision to bring the claims asserted in this action. Walgreens has also been the subject of regulatory scrutiny and sanction concerning their distribution of opioids. Indeed, in March 2013, Walgreens announced a deal that gave it an ownership stake in AmerisourceBergen in exchange for a distribution agreement. [36]

231.   **Collis** is deemed by the Company not to be independent in its 2020 Proxy on Schedule 14A.[37] This is by virtue of the fact that he is the Company's longtime President, Chairman and CEO. Collis served as an officer of the Company or its subsidiaries at all relevant times since 2001, including at the time of the execution of the 2007 settlement agreement with the DEA and the 2017 settlement agreement with the State of West Virginia. Collis's principal professional employment is his employment with AmerisourceBergen, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above – over *$82 million* since 2012. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

---

[35]https://www.sec.gov/Archives/edgar/data/1140859/000104746920000460/a2240346zdef14a.htm (last accessed June 26, 2020).

[36] https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/?arc404=true (last accessed June 26, 2020).

[37]*Id.*

232.    **Durcan** has been a director since September 2015, and was a director when the Company entered into the 2017 settlement with the State of West Virginia. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He knew of the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia, yet ignored his obligation to cause AmerisourceBergen to abide by those obligations. His obligation to cause AmerisourceBergen to abide by those obligations is underscored by his membership on the Governance and Nominating Committee and former membership on the Audit Committee. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

233.    **Gochnauer** has been a director since September 2008 and was a director when the Company entered into the 2017 settlement with the State of West Virginia. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He knew of the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia, yet ignored his obligation to cause AmerisourceBergen to abide by those obligations. His obligation to cause AmerisourceBergen to abide by those obligations is underscored by his membership on the Governance and Nominating Committee and former membership on the Audit Committee. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

234.    **Greenberg** has been a director since May 2013 and was a director when the Company entered into the 2017 settlement with the State of West Virginia. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the

wrongdoing, and failed to act in the face of a known duty to act. He knew of the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia, yet ignored his obligation to cause AmerisourceBergen to abide by those obligations. His obligation to cause AmerisourceBergen to abide by those obligations is underscored by his membership on the Governance and Nominating Committee, Compliance and Risk Committee and former membership on the Audit Committee, of which he was the chair. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

235. **Henney** has been a director since 2002 and was a director when the Company entered into the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia. Accordingly, she served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. She knew of the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia, yet ignored her obligation to cause AmerisourceBergen to abide by those obligations. Her obligation to cause AmerisourceBergen to abide by those obligations is underscored by her membership on the Audit Committee, Governance and Nominating Committee, and Compliance and Risk Committee. Accordingly, there is reason to doubt that she could have made an independent and disinterested decision to bring the claims asserted in this action.

236. **Hyle** has been a director since May 2010 and was a director when the Company entered into the 2017 settlement with the State of West Virginia. Accordingly, she served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. She knew of the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia, yet ignored his obligation

to cause AmerisourceBergen to abide by those obligations. Her obligation to cause AmerisourceBergen to abide by those obligations is underscored by her membership on the Compliance and Risk Committee and former membership on the Audit Committee, of which she was chair. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

237.  **Long** has been a director since May 2006 and was a director when the Company entered into the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He knew of the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia, yet ignored his obligation to cause AmerisourceBergen to abide by those obligations. His obligation to cause AmerisourceBergen to abide by those obligations is underscored by his membership on the Governance and Nominating Committee and former membership on the Audit Committee. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

238.  **McGee** has been a director since November 2004 and was a director when the Company entered into the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He knew of the 2007 Settlement with the DEA and the 2017 settlement with the State of West Virginia, yet ignored his obligation to cause AmerisourceBergen to abide by those obligations. His obligation to cause AmerisourceBergen to abide by those obligations is underscored by his membership on the Audit Committee and Governance and Nominating Committee. Accordingly,

87

there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

239.    Thus, in addition to a majority of the Board facing a substantial likelihood of personal liability, there is reason to doubt that at least five of the Company's ten directors would make an independent and disinterested decision about whether to pursue the claims asserted in this action. Accordingly, demand is excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

240.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

241.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy. In the 2018 Proxy, the Board solicited stockholder votes to reelect defendants (i) Barra, (ii) Collis, (iii) Durcan, (iv) Gochnauer, (v) Greenberg, (vi) Henney, (vii) Hyle, (viii) Long and (ix) McGee to the Board, as well as reject stockholder proposals seeking internal reform related to risks presented by the opioid crisis.

242.    The 2018 Proxy, however, misrepresented and failed to disclose that the Company was engaging in a scheme to gain illicit profits through unlawful means, in direct violation of its federal and state anti-diversion and reporting obligations for distributing controlled substances. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of the defendants' wrongful conduct, AmerisourceBergen misled and deceived its stockholders by making misleading statements that

were essential links in stockholders heeding the Company's recommendation to approve the 2011 Employee Stock Purchase Plan and reelect (i) Barra, (ii) Collis, (iii) Durcan, (iv) Gochnauer, (v) Greenberg, (vi) Henney, (vii) Hyle, (viii) Long and (ix) McGee to the Board. Plaintiff, on behalf of AmerisourceBergen, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy.

243.    Plaintiff, on behalf of AmerisourceBergen, has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Breach of Fiduciary Duty**

244.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

245.    By reason of their status as officers and directors of the Company, the Individual Defendants owed and owe AmerisourceBergen fiduciary duties of loyalty, candor and good faith.

246.    The Individual Defendants breached their fiduciary duties of candor, good faith, and loyalty by creating a culture of lawlessness within AmerisourceBergen, or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

247.    Collis, in his capacity as an officer, either knew, was reckless, or was grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. As an officer, Collis either knew, was reckless, or was grossly negligent in not knowing that the Company engaged in a scheme to proliferate the spread of opioids while failing to comply with the federal and state anti-diversion and reporting obligations for distributing controlled substances. Accordingly, Collis breached his duty of care and loyalty as an officer of the Company.

248.    The Director Defendants, as directors of the Company, owed AmerisourceBergen the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting

the improper activity concerning the unlawful opioid distribution scheme. The Director Defendants knew or were reckless in not knowing that the Company engaged in a scheme to proliferate the spread of opioids while failing to comply with the federal and state anti-diversion and reporting obligations for distributing controlled substances. Accordingly, these defendants breached their duty of loyalty to the Company.

249.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results as required by the Audit Committee Charter in effect at the time.

250.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AmerisourceBergen has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

251.    Plaintiff, on behalf of AmerisourceBergen, has no adequate remedy at law.

<u>**COUNT III**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

252.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

253.    As a result of the Individual Defendants' failure to properly supervise and monitor the adequacy of the Company's order monitoring and diversion program controls and procedures, the Individual Defendants have caused AmerisourceBergen to waste its assets by paying improper

compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

254.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

255.    Plaintiff, on behalf of AmerisourceBergen, has no adequate remedy at law.

<u>**COUNT IV**</u>

**Against the Individual Defendants for Unjust Enrichment**

256.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

257.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AmerisourceBergen. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to AmerisourceBergen.

258.    Plaintiff, as a stockholder and representative of AmerisourceBergen, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

259.    Plaintiff, on behalf of AmerisourceBergen, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that this action is a proper shareholder derivative action and that Plaintiff is an adequate representative of the Company's interests;

91

B.      Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.      Finding that the Director Defendants violated section 14(a) of the Exchange Act;

D.      Finding that the Individual Defendants breached their fiduciary duties to the Company and its stockholders;

E.      Finding that the Individual Defendants wasted the Company's assets;

F.      Finding that the Individual Defendants were unjustly enriched;

G.      Awarding the Company the damages it sustained as a result of the Individual Defendants' misconduct, as well as pre-and post-judgment interest;

H.      Directing AmerisourceBergen to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AmerisourceBergen and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over the distribution of opioids;

2.      a proposal to strengthen the Board's oversight of its diversion control and order monitoring procedures;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4. a provision to permit the stockholders of AmerisourceBergen to nominate at least three candidates for election to the Board;

I. Awarding to Plaintiff its costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses, and if applicable, pre- and post-judgment interest; and

J. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 17, 2020

ASHBY & GEDDES, P.A

/s/ F. Troupe Mickler IV
Stephen E. Jenkins (#2152)
F. Troupe Mickler IV (#5361)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302) 654-1888
sjenkins@ashbygeddes.com
tmickler@ashbygeddes.com

LEVI & KORSINSKY, LLP
Gregory Mark Nespole
Daniel Tepper
55 Broadway, 10th Floor
New York, NY 10006
(212) 363-7500
gnespole@zlk.com
dtepper@zlk.com

*Counsel to Plaintiff*

93

**VERIFICATION**

      I, Charles Emerick o/b/o CCAR Investments, Inc., under penalties of perjury, hereby do declare that CCAR Investments, Inc. is a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

  Print Name: Charles Emerick        Date: 7/13/2020

      IP: 172.248.46.66